**ANHEUSER–BUSCH, INC., a Missouri corporation, Petitioner,**

v.

**FEDERAL TRADE COMMISSION, Respondent.**

No. 12284.

United States Court of Appeals Seventh Circuit.

April 13, 1959.

678

Edgar Barton, New York City, Charles
M. Price, Chicago, Ill. (Robert C. Keck,
Chicago, Ill., Edward Wolfe, New York
City, Dwight Ingamells, St. Louis, Mo.,
MacLeish, Spray, Price & Underwood,
Chicago, Ill., White & Case, New York
City, on the brief), for petitioner.

Earl W. Kintner, Gen. Counsel, Federal Trade Commission, Washington, D.
C. (James E. Corkey, Asst. Gen. Counsel,
Francis C. Mayer, Carleton A. Hark-

rader, Washington, D. C., on the brief), for Federal Trade Commission.

Before DUFFY, Chief Judge, and SCHNACKENBERG and KNOCH, Circuit Judges.

SCHNACKENBERG, Circuit Judge.

By its petition, Anheuser-Busch, Inc., a Missouri corporation, herein referred to as AB, asks us to review and set aside a cease and desist order issued on September 10, 1957 by the Federal Trade Commission, based upon a complaint charging AB with a violation of section 2(a) of the Clayton Act as amended by the Robinson-Patman Act.[1] 15 U.S.C.A. § 13(a).

In its brief, the Commission states that AB was charged in the complaint with territorial price discrimination. The complaint alleged two price reductions on its beer products made by AB to retailers in the St. Louis, Missouri area during 1954, resulting in substantially lower prices to its customers there than to its customers located elsewhere in the United States. AB's answer consisted in part of a denial and contained an affirmative defense that the reductions were made in good faith to meet the equally low prices of competitors. See section 2(b) of the Clayton Act, amended as aforesaid, 15 U.S.C.A. § 13(b).[2]

1. "It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce, where such commodities are sold for use, consumption, or resale within the United States or any Territory thereof or the District of Columbia or any insular possession or other place under the jurisdiction of the United States, and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them: *Provided,* That nothing contained in sections 12, 13, 14–21, and 22–27 of this title shall prevent differentials which make only due allowance for differences in the cost of manufacture, sale, or delivery resulting from the differing methods or quantities in which such commodities are to such purchasers sold or delivered: *Provided, however,* That the Federal Trade Commission may, after due investigation and hearing to all interested parties, fix and establish quantity limits, and revise the same as it finds necessary, as to particular commodities or classes of commodities, where it finds that available purchasers in greater quantities are so few as to render differentials on account thereof unjustly discriminatory or promotive of monopoly in any line of commerce; and the foregoing shall then not be construed to permit differentials based on differences in quantities greater than those so fixed and established: *And provided further,* That nothing contained in sections 12, 13, 14–21, and 22–27 of this title shall prevent persons engaged in selling goods, wares, or merchandise in commerce from selecting their own customers in bona fide transactions and not in restraint of trade: *And provided further,* That nothing contained in sections 12, 13, 14–21, and 22–27 of this title shall prevent price changes from time to time where in response to changing conditions affecting the market for or the marketability of the goods concerned, such as but not limited to actual or imminent deterioration of perishable goods, obsolescence of seasonal goods, distress sales under court process, or sales in good faith in discontinuance of business in the goods concerned."

2. "Upon proof being made, at any hearing on a complaint under this section, that there has been discrimination in price or services or facilities furnished, the burden of rebutting the prima-facie case thus made by showing justification shall be upon the person charged with a violation of this section, and unless justification shall be affirmatively shown, the Commission is authorized to issue an order terminating the discrimination: *Provided, however,* That nothing contained in sections 12, 13, 14–21, and 22–27 of this title shall prevent a seller rebutting the prima-facie case thus made by showing that his lower price or the furnishing of services or facilities to any purchaser or purchasers was made in good faith to meet an equally low price of a competitor, or the services or facilities furnished by a competitor."

Following hearings before an examiner, he entered an initial decision, in which he made findings of fact and concluded that AB had violated section 2(a) as charged, and entered a provisional order. The Commission issued its final order now before us, adopting the findings and conclusions of the examiner,[3] and filed its opinion.

The evidence is not in substantial conflict. As found by the examiner, the controlling facts which we deem material here are, in summary, as follows:

At all times relevant in this case, AB, a manufacturer of beers, including Budweiser, sold its beers on a nationwide basis, in competition with other brewers in commerce. AB and four other named breweries selling on a nationwide basis, sold and shipped into all states. They were known as national brewers and their products as national beers. There were throughout the country a number of beers having merely local or regional distribution.

There were many separate marketing areas for beer in the country. Each market had a distinct pattern of prices and the prices charged for the same beers varied among the different marketing areas. While it appears that there was no uniform or constant differential, in the great majority of markets Budweiser and the other national beers were sold at some price higher than the price charged for beers having merely regional or local distribution.

In 1953, a strike closed the plants of the other four national brewers and AB became the nation's leading producer. After the strike, the national brewers generally increased prices, though in varying amounts depending on locality. However, neither AB nor its three local or regional competitors in the St. Louis area[4] increased their prices on sales in the St. Louis market.

On January 4, 1954 and June 21, 1954, AB reduced its prices on Budweiser beer in the St. Louis market to practically equal those charged for local and regional beers there. These reductions AB did not make elsewhere.

These price cuts, the Commission held, constituted a discrimination in price "as between purchasers differently located". The examiner found, and the Commission concurred, that these price "discriminations" had the effect of diverting substantial business to AB from its competitors in the St. Louis market; the effect of substantially lessening competition in the line of commerce in which AB and its local competitors "are engaged"; and the further effect of tending to create a monopoly and having the potentialities to continue to do so.

We find it unnecessary to determine whether the evidence proved the effects to which the Commission alluded, or whether the evidence established AB's affirmative defense of good faith.

The Commission makes it clear that no complaint is made by it as to AB's regular practice of selling its beer at different prices in the different markets of the country. It says:

"We are concerned only with the lowering of the price in one area while maintaining prices in all other areas albeit the maintained prices might be different prices.

" * * * The proceeding was designed to stop a predatory pricing practice, a practice by which a national seller can disrupt any given market to the injury of its local competitors in that market.

" * * * The Commission found the price reductions confined to the St. Louis area to be price discriminations violative of Section 2(a) of the amended Clayton Act. Petitioner maintains there was no violation of law."

We are confronted here with the basic question of whether AB's price cuts in the St. Louis area, which, as contended by the Commission, disrupted that mar-

3. It modified in some respects the provisional order to cease and desist.

4. Falstaff, Griesedieck Western and Griesedieck Brothers.

ket to the injury of its local competitors in *that* market, were price discriminations within the proscription of section 2(a). Even if we assume that these cuts were directed at AB's local competitors, they were not *discriminatory*. AB did not thereby *discriminate* among its local competitors in the St. Louis area. By its cuts AB employed the same means of competition against all of them. Moreover, it did not discriminate among those who *bought* its beer in the St. Louis area; all could buy at the same prices. We have here, as far as the St. Louis area is concerned, a nondiscriminatory pricing activity, as to which the affirmative defense of good faith becomes relevant only if the price cuts constituted a violation of section 2(a).

■ Actually the only discrimination claimed is said to result from AB's St. Louis price cuts when it failed to make similar cuts in other areas. But it is significant that the Commission is not seeking to protect AB's competitors in the other areas. In fact the Commission does not even say that they have been injured. In effect, the situation is that, while the cuts were discriminatory against AB's competitors only in other areas (about which there is no complaint by the Commission) and the effects on AB's local competitors in the St. Louis area were not discriminatory as among them, the Commission argues that section 2(a) can be used "to stop a predatory pricing practice" in that area. However, it is not every price difference that amounts to a discrimination in price under the Act. Price discrimination means more than a mere difference in price. There must be some relationship between the different purchasers which entitles them to comparable treatment. Inasmuch as the Commission admits that the prices charged in the St. Louis area, on the one hand, and in other areas, on the other hand, were different and that this difference is not the subject of its complaint, it is clear that the mere fact of difference in price resulting from difference of markets, is not price discrimina-

tion under the Act. The Commission complains only about the lowering of the price in one area while the prices in all other areas are maintained, albeit the maintained prices might be different from those charged in the area where the lowering took place. But Representative Utterback, a manager of the conference bill which became section 2(a) (80 Cong. Rec. 9416), stated:

"In its meaning as simple English a discrimination is more than a mere difference. Underlying the meaning of the word is the idea that some relationship exists between the parties to the discrimination which entitles them to equal treatment, whereby the difference granted to one casts some burden or disadvantage upon the other. If the two are competing in the resale of the goods concerned, that relationship exists. Where, also, the price to one is so low as to involve a sacrifice of some part of the seller's necessary costs and profit as applied to that business, it leaves that deficit inevitably to be made up in higher prices to his other customers; and there, too, a relationship may exist upon which to base the charge of discrimination. But where no such relationship exists, where the goods are sold in different markets and the conditions affecting those markets set different price levels for them, the sale to different customers at those different prices would not constitute a discrimination within the meaning of this bill."

■■ Where two purchasers from a seller are competing with each other, that competition creates a relationship that entitles them to comparable treatment as to price, without which treatment there would be a discrimination in price within the meaning of section 2(a). On the other hand, in a case like this, where the purchasers from a seller are located in different areas of the country and are not in competition with each other, there is generally no relationship

which entitles them to be charged the same prices. This is particularly true when different prices in different markets are characteristic of all sellers in the industry. Thus, a retailer in Boston or San Francisco, in paying a higher price for beer than a retailer in St. Louis or Chicago, is in no way prejudiced or treated unfairly.

Moreover, if it were assumed that AB's price cuts in the St. Louis area were injurious to its customers in some other area and that the latter customers were given by section 2(a) a right to relief, we find no language in that section transferring that right to AB's *competitors* in the St. Louis area. It is a complete *non sequitur* to say that, because AB's acts gave its *customers* in *another* area a right to relief, its *St. Louis* market *competitors* became entitled to relief under section 2(a). Certainly congress has not said so in that section and we have no right to extend the section to benefit a group which lies beyond the purpose and scope of the language used.

■ Lacking a showing of discrimination within the St. Louis area, there is no relationship existing between AB's competitors in that area and either its competitors or its customers in other areas which justifies the Commission's conclusion that a discrimination has been shown in the St. Louis area which brings section 2(a) into play. In reality, the Commission is not complaining of a price discrimination between purchasers in different markets, but rather of a lowering in price in St. Louis, whether or not discriminatory. But section 2(a) says nothing about lowering prices in any market. Such a practice congress did meet head-on when, in 1936, it enacted section 3 of the Robinson-Patman Act, 15 U.S.C.A. § 13a, which does not amend the Clayton Act, but stands on its own footing and carries its own sanctions. Nashville Milk Co. v. Carnation Company, 355 U.S. 373, 78 S.Ct. 352, 2 L. Ed.2d 340, affirming our decision, 7 Cir., 238 F.2d 86. As the Supreme Court said in that case 355 U.S. at page 377, 78 S.Ct. at page 354 in regard to section 3:

> " * * * It prohibits three kinds of trade practices, (a) general price discriminations, (b) geographical price discriminations, and (c) selling 'at unreasonably low prices for the purpose of destroying competition or eliminating a competitor.' * * * "

Although there is a partial overlap between the price discrimination clauses of section 3 of the Robinson-Patman Act and those of section 2 of the Clayton Act, as amended by the first section of the Robinson-Patman Act, as stated by the Supreme Court in the Nashville Milk Co., supra, 355 U.S. at page 378, 78 S.Ct. at page 355, we do not find in section 2 (a) the price discrimination proscription sought by the Commission in this case. On the other hand, section 3 of the Robinson-Patman Act, in the prohibitions [(b) and (c) pointed out by the Supreme Court, supra] has imposed severe sanctions on geographical price discriminations and selling at unreasonably low prices for the purpose of destroying competition or eliminating a competitor.

■ The fact that the Commission has not been given power by 15 U.S.C.A. § 21 to enforce section 3, which is known as 15 U.S.C.A. § 13a, does not justify an attempt by it to enlarge the scope of section 2(a) to include a matter lying expressly within the scope of section 3.

Neither by a charge in the complaint nor by the evidence has the Commission shown a violation by AB of section 2(a) of the Act. For the foregoing reasons, therefore, the cease and desist order issued by the Commission on September 10, 1957, is set aside.

Order set aside.