FEDERAL TRADE COMMISSION *v.* ANHEUSER-
BUSCH, INC.

No. 389.   Argued March 2, 1960.—Decided June 20, 1960.

*Philip Elman* argued the cause for petitioner. With him on the briefs were *Solicitor General Rankin, Acting Assistant Attorney General Bicks, Ralph S. Spritzer, Richard A. Solomon, Irwin A. Seibel, Daniel J. McCauley, Jr.* and *Alan B. Hobbes.*

*Edgar Barton* argued the cause for respondent. With him on the brief were *Charles M. Price, Robert C. Keck* and *Thomas J. Carroll.*

MR. CHIEF JUSTICE WARREN delivered the opinion of the Court.

The question presented is whether certain pricing activities of respondent, Anheuser-Busch, Inc., constituted price discrimination within the meaning of § 2 (a) of the Clayton Act, 38 Stat. 730, as amended by the Robinson-Patman Act, 49 Stat. 1526, 15 U. S. C. § 13 (a).

Section 2 (a) provides in pertinent part:

"That it shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce, where such commodities are sold for use, consumption, or resale within the United States or any Territory thereof or the District of Columbia or any insular possession or other place under the jurisdiction of the United States, and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them. . . ."

This controversy had its genesis in a complaint issued by the Federal Trade Commission in 1955, which charged respondent, a beer producer, with a violation of § 2 (a). The complaint alleged that respondent had "discriminated in price between different purchasers of its beer of like grade and quality by selling it to some of its customers at higher prices than to other[s]"; that, more specifically, respondent had lowered prices in the St. Louis, Missouri, market, without making similar price reductions in other markets; that this discrimination had already diverted substantial business from respondent's St. Louis competitors; that it was "sufficient" to have the same impact in the future; that there was a "reasonable probability" it would substantially lessen competition in respondent's line of commerce; and that it might also tend to create a monopoly or to injure, destroy, or prevent competition with respondent. Thus the complaint described a pricing pattern which had adverse effects only upon sellers' competition, commonly termed primary-line competition, and not upon buyers' competition, commonly termed secondary-line competition.

Both the hearing examiner and, on appeal, the Commission held that the evidence introduced at the hearing established a violation of § 2 (a). The Commission found the facts to be as follows:

Respondent, a leading national brewer,[1] sells a so-called premium beer, which is priced higher than the beers of regional and local breweries in the great majority of markets, although both the price of respondent's beer and the premium differential vary from market to market and from time to time. During the period relevant to this case, respondent had three principal competitors in the St. Louis area, all regional breweries: Falstaff Brewing

---

[1] Anheuser-Busch ranked second nationally in gross sales in 1952 and 1955, and first in 1953 and 1954.

Corporation, Griesedieck Western Brewing Company, and Griesedieck Brothers Brewery Company.[2]   In accord with the generally prevailing price structure, these breweries normally sold their products at a price substantially lower than respondent's.

In 1953, most of the national breweries, including respondent, granted their employees a wage increase, and on October 1, 1953, they put into effect a general price increase.[3]   Although many regional and local breweries throughout the country followed suit by raising their prices, Falstaff, Griesedieck Western, and Griesedieck Brothers maintained their pre-October price of $2.35 per standard case.   Although respondent's sales in the St. Louis area did not decline, its national sales fell, along with industry sales in general.

On January 4, 1954, respondent lowered its price in the St. Louis market from $2.93 to $2.68 per case, thereby reducing the previous 58¢ differential to 33¢.   A second price cut occurred on June 21, 1954, this time to $2.35, the same price charged by respondent's three competitors. On January 3, 1954, the day before the first price cut, respondent's price in the St. Louis market had been lower

---

[2] It appears that Griesedieck Western sold out to Carling Brewing Company in October, 1954.

[3] Respondent maintains—and petitioner agrees—that the evidence establishes that it did not raise its prices in Missouri or Wisconsin. In view of our disposition of the case, this is immaterial to the issue presented on this review.

Possibly we should note that most of the facts in this particular paragraph are taken from the initial decision.   Although the Commission adopted "the findings, conclusions, and order, as modified, contained in the initial decision," there is some disagreement as to how encompassing this incorporation order was.   See note 10, *infra*. Since that dispute concerns matters not relevant to our decision, and since the facts set forth above are merely background and appear to be unquestioned, we find it unnecessary to resolve the disagreement.

than its price in other markets,[4] and during the period of the price reductions in the St. Louis area, respondent made no similar price reductions in any other market. In March, 1955, respondent increased its St. Louis price 45¢ per case, and Falstaff, Griesedieck Western, and Griesedieck Brothers almost immediately raised their prices 15¢, which re-established a substantial differential. This ended the period of alleged price discrimination.

The Commission concluded:

> "As a result of maintaining higher prices to all purchasers outside of the St. Louis area and charging the lower prices, as reduced in 1954, to only those customers in the St. Louis area, respondent discriminated in price as between purchasers differently located."

Since, as will appear, it is this aspect of the decision which concerns us, it is necessary only to sketch summarily the remaining elements in the Commission's decision. The Commission's finding of competitive injury was predicated to a substantial degree upon what it regarded as a demonstrated diversion of business to respondent from its St. Louis competitors during the period of price discrimination. For example, by comparing that period with a similar period during the previous year, the Commission determined that respondent's sales had risen 201.5%, Falstaff's sales had dropped

---

[4] The following table discloses the degree of this price spread:

| | | | |
|---|---|---|---|
| St. Louis, Mo | $2.93 | Washington, D. C | $3.65 |
| Chicago, Ill | 3.44 | Detroit, Mich | 3.55 |
| Cincinnati, Ohio | 3.75 | Boston, Mass | 3.69 |
| Houston, Tex | 3.70 | Kansas City, Mo | 3.15 |
| Bronx, N. Y | 3.68 | St. Paul, Minn | 3.53 |
| Kearney, Nebr | 3.68 | Sioux Falls, S. Dak | 3.50 |
| St. Joseph, Mo | 3.17 | Denver, Colo | ... |
| Buffalo, N. Y | 3.60 | San Francisco, Calif | 3.79 |
| Baltimore, Md | 3.62 | Los Angeles, Calif | 3.80 |

slightly, Griesedieck Western's sales had fallen about 33%, and Griesedieck Brothers' sales had plummeted about 41%. In tabular form, the relative market positions of the St. Louis sellers were as follows:

|  | Dec. 31 1953 | June 30 1954 | Mar. 1 1955 | July 31 1955 |
|---|---|---|---|---|
| Respondent | 12.5 | 16.55 | 39.3 | 21.03 |
| Griesedieck Brothers | 14.4 | 12.58 | 4.8 | 7.36 |
| Falstaff | 29.4 | 32.05 | 29.1 | 36.62 |
| Griesedieck Western | 38.9 | 33. | 23.1 | 27.78 |
| All others | 4.8 | 5.82 | 3.94 | 7.21 |

The Commission rejected respondent's contention that its price reductions had been made in good faith to meet the equally low price of a competitor within the meaning of the proviso to § 2 (b) of the Act, 49 Stat. 1526, 15 U. S. C. § 13 (b), and also found respondent's attack upon the examiner's cease-and-desist order to be meritless. The Commission thereupon adopted and issued that order, with only slight modification.[5]

On review, the Court of Appeals set aside the order. 265 F. 2d 677. We granted certiorari, 361 U. S. 880, because a conflict had developed among the Courts of Appeals on a question of importance in the administration of the statute. See *Atlas Building Products Co.* v. *Diamond Block & Gravel Co.,* 269 F. 2d 950 (C. A. 10th Cir.).

---

[5] "It Is Ordered that the respondent, Anheuser-Busch, Inc., a corporation, and its officers, representatives, agents and employees, directly or through any corporate or other device, in the sale of beer of like grade and quality, do forthwith cease and desist from discriminating, directly or indirectly, in price, between different purchasers engaged in the same line of commerce, where either, or any, of the purchases involved in such discrimination are in commerce, as 'commerce' is defined in the Clayton Act, by a price reduction in any market where respondent is in competition with any other seller, unless it proportionally reduces its prices everywhere for the same quantity of beer."

The limited nature of our inquiry can be fully appreciated only in the light of the correspondingly narrow decision of the Court of Appeals, which rested entirely upon the holding that the threshold statutory element of price discrimination had not been established. Thus the Court of Appeals did not consider whether the record supported a finding of the requisite competitive injury, whether respondent's good faith defense was valid, or whether the Commission's order was unduly broad. We have concluded that the Court of Appeals erred in its construction of § 2 (a) and that the evidence fully warranted the Commission's finding of price discrimination. Respondent would have us affirm nonetheless on any of the alternative grounds it strongly urged below. While this is, to be sure, an appropriate course of action under proper circumstances, we believe that it would be unwise for us to grapple with these intricate problems, the solution to which requires a careful examination of a voluminous record, before they have been dealt with by the Court of Appeals. Therefore, the case will be remanded, and of course nothing in this opinion should be interpreted as intimating a view upon the remaining aspects of the controversy.

A discussion of the import of the § 2 (a) phrase "discriminate in price," in the context of this case, must begin with a consideration of the purpose of the statute with respect to primary-line competition. The Court of Appeals expressed some doubt that § 2 (a) was designed to protect this competition at all, but respondent has not undertaken to defend that position here. This is entirely understandable. While "precision of expression is not an outstanding characteristic of the Robinson-Patman Act," *Automatic Canteen Co.* v. *Federal Trade Comm'n,* 346 U. S. 61, 65, it is certain at least that § 2 (a) is violated where there is a price discrimination which deals the requisite injury to primary-line competition, even

though secondary-line and tertiary-line competition are unaffected. The statute could hardly be read any other way, for it forbids price discriminations "where the effect . . . may be substantially to lessen competition or tend to create a monopoly *in any line of commerce,* or to injure, destroy, or prevent competition with any person *who either grants* or knowingly receives the benefit of such discrimination, or with customers of either of them." (Emphasis added.)

The legislative history of § 2 (a) is equally plain. The section, when originally enacted as part of the Clayton Act in 1914, was born of a desire by Congress to curb the use by financially powerful corporations of localized price-cutting tactics which had gravely impaired the competitive position of other sellers.[6] It is, of course, quite true—and too well known to require extensive exposition—that the 1936 Robinson-Patman amendments to the Clayton Act were motivated principally by congres-

---

[6] "Section 2 of the bill . . . is expressly designed with the view of correcting and forbidding a common and widespread unfair trade practice whereby certain great corporations and also certain smaller concerns which seek to secure a monopoly in trade and commerce by aping the methods of the great corporations, have heretofore endeavored to destroy competition and render unprofitable the business of competitors by selling their goods, wares, and merchandise at a less price in the particular communities where their rivals are engaged in business than at other places throughout the country. . . . In the past it has been a most common practice of great and powerful combinations engaged in commerce—notably the Standard Oil Co., and the American Tobacco Co., and others of less notoriety, but of great influence—to lower prices of their commodities, oftentimes below the cost of production in certain communities and sections where they had competition, with the intent to destroy and make unprofitable the business of their competitors, and with the ultimate purpose in view of thereby acquiring a monopoly in the particular locality or section in which the discriminating price is made. . . ." H. R. Rep. No. 627, 63d Cong., 2d Sess. 8. See also S. Rep. No. 698, 63d Cong., 2d Sess. 2–4.

sional concern over the impact upon secondary-line competition of the burgeoning of mammoth purchasers, notably chain stores.[7]  However, the legislative history of these amendments leaves no doubt that Congress was intent upon strengthening the Clayton Act provisions, not weakening them, and that it was no part of Congress' purpose to curtail the pre-existing applicability of § 2 (a) to price discriminations affecting primary-line competition.[8]

The federal courts, both before and after the amendment of § 2 (a), have taken this view of the scope of the statute in cases involving impairment of primary-line competition.  See *Porto Rican American Tobacco Co.* v. *American Tobacco Co.*, 30 F. 2d 234 (C. A. 2d Cir. 1929); *E. B. Muller & Co.* v. *Federal Trade Comm'n*, 142 F. 2d 511 (C. A. 6th Cir. 1944); *Maryland Baking Co.* v. *Federal Trade Comm'n*, 243 F. 2d 716 (C. A. 4th Cir. 1957); . *Atlas Building Products Co.* v. *Diamond Block & Gravel Co., supra* (1959).  In fact, the original focus of § 2 (a) on sellers' competition was so evident that this Court was compelled to hold explicitly, contrary to lower court decisions,[9] that the statute was not *restricted* to price discriminations impeding primary-line competition, but protected secondary-line competition as well.  *Van Camp &*

---

[7] See H. R. Rep. No. 2287, 74th Cong., 2d Sess.; S. Rep. No. 1502, 74th Cong., 2d Sess.; F. T. C., Final Report on the Chain-Store Investigation, S. Doc. No. 4, 74th Cong., 1st Sess.; *Federal Trade Comm'n* v. *Morton Salt Co.*, 334 U. S. 37, 43; Report of the Attorney General's National Committee to Study the Antitrust Laws, 155–156; Austin, Price Discrimination and Related Problems under the Robinson-Patman Act (2d rev. ed., 1959), 8–11; Palamountain, The Politics of Distribution, 188–234; Rowe, The Evolution of the Robinson-Patman Act: A Twenty-Year Perspective, 57 Col. L. Rev. 1059.

[8] See sources cited in note 7, *supra*.

[9] See *Mennen Co.* v. *Federal Trade Comm'n*, 288 F. 774; *National Biscuit Co.* v. *Federal Trade Comm'n*, 299 F. 733.

*Sons* v. *American Can Co.*, 278 U. S. 245 (1929). And more recently, in *Moore* v. *Mead's Fine Bread Co.*, 348 U. S. 115 (1954), the Court sustained a treble damage judgment in favor of a competing seller which was based partly upon a violation of § 2 (a).

Thus neither the language of § 2 (a), its legislative history, nor its judicial application countenances a construction of the statute which draws strength from even a lingering doubt as to its purpose of protecting primary-line competition. But the rationale of the Court of Appeals appears to have been shaped by precisely this type of doubt. The view of the Court of Appeals was that, before there can be a price discrimination within the meaning of § 2 (a), "[t]here must be some relationship between the different purchasers which entitles them to comparable treatment." 265 F. 2d, at 681. Such a relationship would exist, the court reasoned, if different prices were being charged to *competing* purchasers. But the court observed that in this case all *competing* purchasers paid respondent the same price, so far as the record disclosed. Consequently, the court concluded that, even assuming the price cuts "were directed at [Anheuser-Busch's] local competitors, they were not *discriminatory.*" [10]   *Ibid.*

This qualification upon the applicability of § 2 (a) to primary-line-competition cases is in no way adumbrated by the prevailing line of relevant decisions. In *Mead's Fine Bread Co., supra,* in *Maryland Baking Co., supra,* and in *Porto Rican American Tobacco Co., supra,* violations of § 2 (a) were predicated upon injury to primary-line competition without reliance upon the presence or

---

[10] There is a dispute as to whether the Commission adopted a finding by the examiner which related to the purpose of the price reductions. Since we conclude that the issue of predatory intent is irrelevant to the question before us, it is unnecessary for us to resolve this dispute.

absence of competition among purchasers as a relevant factor. And in *Muller & Co., supra,* while there was evidence that the purchasers in question were competing, the court explicitly rejected the notion that this was a necessary element of a violation in a primary-line case. 142 F. 2d, at 518. But cf. *Balian Ice Cream Co.* v. *Arden Farms Co.,* 231 F. 2d 356.

More important, however, is the incompatibility of the Circuit Court's rule with the purpose of § 2 (a). The existence of competition among buyers who are charged different prices by a seller is obviously important in terms of adverse effect upon secondary-line competition, but it would be merely a fortuitous circumstance so far as injury to primary-line competition is concerned. Since, as we have indicated, an independent and important goal of § 2 (a) is to extend protection to competitors of the discriminating seller, the limitation of that protection by the alien factor of competition among purchasers would constitute a debilitating graft upon the statute.

Although respondent's starting point is the same as that of the Court of Appeals—that a price discrimination is not synonymous with a price difference—its test of price discrimination is somewhat broader.[11] Respondent concedes that a competitive relationship among purchasers is not a prerequisite of price discrimination, but maintains that at least there must be "proof that the lower price is below cost or unreasonably low for the purpose or design to eliminate competition and thereby obtain a monopoly." Since such a finding is lacking here, respondent argues that it cannot be said that there was price discrimination.

---

[11] Respondent maintains that the opinion of the Court of Appeals may and should be read to encompass respondent's views. It is true that there are certain passages in the opinion which lend some support to respondent's interpretation. In view of our disposition of the case, it is unnecessary for us either to accept or reject that construction.

Respondent asserts that its view is supported by legislative history, court decisions, and reason. Respondent relies heavily, as did the Court of Appeals, upon a statement made during Congress' consideration of the Robinson-Patman legislation by Representative Utterback, a manager of the conference bill which became § 2 (a). In this rather widely quoted exegesis of the section, Representative Utterback declared that "a discrimination is more than a mere difference," and exists only when there is "some relationship . . . between the parties to the discrimination which entitles them to equal treatment." Such a relationship would prevail among competing purchasers, according to the Congressman, and also "where . . . the price to one is so low as to involve a sacrifice of some part of the seller's necessary costs and profit," so that "it leaves that deficit inevitably to be made up in higher prices to his other customers." 80 Cong. Rec. 9416.[12] Respondent also cites expressions in the legislative history of the Clayton Act which reflect Congress' concern over classic examples of predatory business practices. See H. R. Rep. No. 627, 63d Cong., 2d

---

[12] The statement in full is as follows:

"In its meaning as simple English, a discrimination is more than a mere difference. Underlying the meaning of the word is the idea that some relationship exists between the parties to the discrimination which entitles them to equal treatment, whereby the difference granted to one casts some burden or disadvantage upon the other. If the two are competing in the resale of the goods concerned, that relationship exists. Where, also, the price to one is so low as to involve a sacrifice of some part of the seller's necessary costs and profit as applied to that business, it leaves that deficit inevitably to be made up in higher prices to his other customers; and there, too, a relationship may exist upon which to base the charge of discrimination. But where no such relationship exists, where the goods are sold in different markets and the conditions affecting those markets set different price levels for them, the sale to different customers at those different prices would not constitute a discrimination within the meaning of this bill."

Sess. 8; S. Rep. No. 698, 63d Cong., 2d Sess. 2–4. Moreover, respondent maintains that the principle it advances has found expression in the decisions of the federal courts in primary-line-competition cases, which consistently emphasize the unreasonably low prices and the predatory intent of the defendants.[13] Respondent also urges that its view is grounded upon the statutory scheme of § 2 (a), which penalizes sellers only if an anticompetitive effect stems from a *discriminatory* pricing pattern, not if it results merely from a low price. Thus, the argument goes, unless there is proof that high prices in one area have subsidized low prices in another, the price differential does not fall within the compass of the section. In such a case, it is contended, § 3 of the Robinson-Patman Act, 49 Stat. 1528, 15 U. S. C. § 13a, may be applicable, but not § 2 (a).[14] Finally, respondent argues that, unless its position is accepted, the law will impose rigid price uniformity upon the business world, contrary to sound economics and the policy of the antitrust laws.

---

[13] See, *e. g., Porto Rican American Tobacco Co.* v. *American Tobacco Co., supra; Atlas Building Products Co.* v. *Diamond Block & Gravel Co., supra; Maryland Baking Co.* v. *Federal Trade Comm'n, supra.*

[14] Section 3 provides:

"It shall be unlawful for any person engaged in commerce, in the course of such commerce, to be a party to, or assist in, any transaction of sale, or contract to sell, which discriminates to his knowledge against competitors of the purchaser, in that, any discount, rebate, allowance, or advertising service charge is granted to the purchaser over and above any discount, rebate, allowance, or advertising service charge available at the time of such transaction to said competitors in respect of a sale of goods of like grade, quality, and quantity; to sell, or contract to sell, goods in any part of the United States at prices lower than those exacted by said person elsewhere in the United States for the purpose of destroying competition, or eliminating a competitor in such part of the United States; or, to sell, or contract to sell, goods at unreasonably low prices for the purpose of destroying competition or eliminating a competitor."

The trouble with respondent's arguments is not that they are necessarily irrelevant in a § 2 (a) proceeding, but that they are misdirected when the issue under consideration is solely whether there has been a price discrimination. We are convinced that, whatever may be said with respect to the rest of §§ 2 (a) and 2 (b)—and we say nothing here—there are no overtones of business buccaneering in the § 2 (a) phrase "discriminate in price." Rather, a price discrimination within the meaning of that provision is merely a price difference.

When this Court has spoken of price discrimination in § 2 (a) cases, it has generally assumed that the term was synonymous with price differentiation. In *Federal Trade Comm'n* v. *Cement Institute*, 333 U. S. 683, 721, the Court referred to "discrimination in price" as "selling the same kind of goods cheaper to one purchaser than to another." And in *Federal Trade Comm'n* v. *Morton Salt Co.*, 334 U. S. 37, 45, the Court said, "Congress meant by using the words 'discrimination in price' in § 2 that in a case involving competitive injury between a seller's customers the Commission need only prove that a seller had charged one purchaser a higher price for like goods than he had charged one or more of the purchaser's competitors." [15] The commentators have generally shared this view.[16]

---

[15] See also *Federal Trade Comm'n* v. *Staley Co.*, 324 U. S. 746, 757; *Samuel H. Moss, Inc.*, v. *Federal Trade Comm'n*, 148 F. 2d 378, 379, 155 F. 2d 1016. Compare *Automatic Canteen Co.* v. *Federal Trade Comm'n, supra*, at 70 n. 10, 71.

[16] See Att'y Gen. Nat'l Comm. Antitrust Rep. 156; Austin, Price Discrimination and Related Problems Under the Robinson-Patman Act (2d rev. ed. 1959), 18–20; McAllister, Price Control by Law in the United States: A Survey, 4 Law and Contemp. Prob. 273, 291–293; Rowe, Price Differentials and Product Differentiation: The Issues Under the Robinson-Patman Act, 66 Yale L. J. 1, 36–38; Comment, 12 Stan. L. Rev. 460, 461. But see Zorn and Feldman, Business Under The New Price Laws, 75.

These assumptions, we now conclude, were firmly rooted in the structure of the statute, for it is only by equating price discrimination with price differentiation that § 2 (a) can be administered as Congress intended. As we read that provision, it proscribes price differences, subject to certain defined defenses,[17] where the effect of the differences "may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit" of the price differential, "or with customers of either of them." See *Federal Trade Comm'n* v. *Morton Salt Co.*, 334 U. S. 37, 45-47. In other words, the statute itself spells out the conditions which make a price difference illegal or legal, and we would derange this integrated statutory scheme were we to read other conditions into the law by means of the nondirective phrase, "discriminate in price." Not only would such action be contrary to what we conceive to be the meaning of the statute, but, perhaps because of this, it would be thoroughly undesir-

---

[17] In addition to the statutory provisions regarding injury to competition, set out at p. 537, *supra*, there are other relevant portions of the statute, such as the seller's § 2 (b) defense of "showing that his lower price . . . was made in good faith to meet an equally low price of a competitor . . . ." And a proviso to § 2 (a) states:
"That nothing herein contained shall prevent differentials which make only due allowance for differences in the cost of manufacture, sale, or delivery resulting from the differing methods or quantities in which such commodities are to such purchasers sold or delivered . . . ."
And still another proviso to § 2 (a) states:
"That nothing herein contained shall prevent price changes from time to time where in response to changing conditions affecting the market for or the marketability of the goods concerned, such as but not limited to actual or imminent deterioration of perishable goods, obsolescence of seasonal goods, distress sales under court process, or sales in good faith in discontinuance of business in the goods concerned."

able. As one commentator has succinctly put it, "Inevitably every legal controversy over any price difference would shift from the detailed governing provisions—'injury,' cost justification, 'meeting competition,' etc.—over into the 'discrimination' concept for *ad hoc* resolution divorced from specifically pertinent statutory text." Rowe, Price Differentials and Product Differentiation: The Issues Under the Robinson-Patman Act, 66 Yale L. J. 1, 38.[18]

In the face of these considerations, we do not find respondent's arguments persuasive. The fact that activity which falls within the civil proscription of § 2 (a) may also be criminal under § 3 is entirely irrelevant. The partial overlap between these sections, which was to a significant extent the by-product of the tortuous path of the Robinson-Patman bills through Congress,[19] has been widely recognized. "[T]his section [§ 3] does not restrict the operation of the prohibitions, with civil sanctions, of the Robinson-Patman amendments to § 2 (a) of the Clayton Act." *Corn Products Co.* v. *Federal Trade Comm'n,* 324 U. S. 726, 734.[20]

---

[18] See also Austin, Price Discrimination and Related Problems Under the Robinson-Patman Act (2d rev. ed. 1959), 18–20; McAllister, Price Control by Law in the United States: A Survey, 4 Law and Contemp. Prob. 273, 291–293.

[19] See Palamountain, The Politics of Distribution, 188–234; Rowe, The Evolution of the Robinson-Patman Act: A Twenty-Year Perspective, 57 Col. L. Rev. 1059.

[20] "Subsection (h) of the Senate amendment . . . appears in the conference report as section 3 of the bill itself. It contains the operative and penal provisions of what was originally the Borah-Van Nuys bill (S. 4171). While they overlap in some respects, they are in no way inconsistent with the provisions of the Clayton Act amendment provided for in section 1. Section 3 authorizes nothing which that amendment prohibits, and takes nothing from it. On the contrary, where only civil remedies and liabilities attach to violations of the amendment provided in section 1, section 3 sets up special prohibi-

The other materials adduced by respondent do no more than indicate that the factors in question—predatory intent and unreasonably low local price cuts—may possibly be relevant to other matters which may be put in issue in a § 2 (a) proceeding. For example, it might be argued that the existence of predatory intent bears upon the likelihood of injury to competition,[21] and that a price reduction below cost tends to establish such an intent.[22] Practically all of the legislative materials and court decisions relied upon by respondent are explicable on this basis, since hardly any of them are concerned specifically with the meaning of price discrimination.[23] Moreover, many of the legislative expressions cited by respondent may merely be descriptive of the prototype of the evil

---

tions as to the particular offenses therein described and attaches to them also the criminal penalties therein provided." H. R. Rep. No. 2951, 74th Cong., 2d Sess. 8. See also *Nashville Milk Co.* v. *Carnation Co.*, 355 U. S. 373, 378; Austin, Price Discrimination and Related Problems Under the Robinson-Patman Act (2d rev. ed. 1959), 3–4; 108 U. of Pa. L. Rev. 116, 121; 45 Va. L. Rev. 1397, 1400; sources cited in note 19, *supra*.

[21] Of course we do not depart from our holding in *Federal Trade Comm'n* v. *Morton Salt, supra*, at pp. 50–51, as to adequacy of proof of tendency to injure competition in cases involving discrimination between purchasers. The instant case, as we have pointed out, involves differences in prices among competing sellers.

[22] See *Balian Ice Cream Co.* v. *Arden Farms Co., supra*, at 369; Report of the Attorney General's National Committee to Study the Antitrust Laws, 165; Rowe, Price Discrimination, Competition, and Confusion: Another Look at Robinson-Patman, 60 Yale L. J. 929, 956; The "New" Federal Trade Commission and the Enforcement of the Antitrust Laws, 65 Yale L. J. 34, 74–75; A Symposium on the Robinson-Patman Act, 49 N. W. U. L. Rev. 197, 215, 224. But cf. *Nashville Milk Co.* v. *Carnation Co.*, 355 U. S. 373, 378; *Federal Trade Comm'n* v. *Ruberoid Co.*, 343 U. S. 470, 484 (dissenting opinion).

[23] Perhaps it is worth noting in this connection that the Senate and House committee reports appear to use the words "discrimination" and "differential" interchangeably. See H. R. Rep. No. 2287, 74th Cong., 2d Sess. 10; S. Rep. No. 1502, 74th Cong., 2d Sess. 5.

with which Congress dealt in § 2 (a), rather than delineative of the outer reach of that section. A possible exception is the statement of Representative Utterback. But the primary function of statutory construction is to effectuate the intent of Congress, and that function cannot properly be discharged by reliance upon a statement of a single Congressman, in the face of the weighty countervailing considerations which are present in this case.[24]

Nothing that we have said, of course, should be construed to be the expression of any view concerning the relevance of the factors stressed by respondent to statutory standards other than price discrimination. We wish merely to point out, on the one hand, why respondent's arguments in our view are not pertinent to the issue at bar, and, on the other, that we are not foreclosing respondent from urging in the Court of Appeals that such arguments are material to issues not now before us.

What we have said makes it quite evident, we believe, that our decision does not raise the specter of a flat prohibition of price differentials, inasmuch as price differences constitute but one element of a § 2 (a) violation. In fact, as we have indicated, respondent has vigorously contested this very case on the entirely separate grounds of insufficient injury to competition and good faith lowering of price to meet competition. Nor is it relevant that the Commission did not proceed upon the basis of the respondent's price differentials which existed prior to the period in question in this case. This choice is committed to the

---

[24] Representative Utterback's comment has been criticized as "ambiguous and misleading and . . . too often accepted without analysis." Austin, Price Discrimination and Related Problems Under the Robinson-Patman Act (2d rev. ed. 1959), 18. It is, of course, possible that the Congressman was so intent upon the immediate problem—protection of secondary-line competition—that he did not reflect upon the significance of his statement when applied to primary-line cases.

discretion of the Commission; and it may well be that the Commission did not believe the remaining statutory elements could be established with respect to other differentials. Our interest is solely with this case, and at this stage of the litigation that interest is confined exclusively to identifying and keeping distinct the various statutory standards which are part of the § 2 (a) complex.

The judgment of the Court of Appeals is reversed and the case is remanded to that court for further proceedings not inconsistent with this opinion.

*Reversed.*