**LOREN SPECIALTY MFG. CO., Inc., an Illinois corporation, Plaintiff,**

v.

**The CLARK MANUFACTURING COMPANY, a corporation, Robert F. Gleason and Arnold A. Hanson, Defendants.**

**No. 58 C 229.**

United States District Court
N. D. Illinois, E. D.
April 16, 1965.

Clarence F. Martin, Chicago, Ill., for plaintiff.

H. Blair White, Sidley, Austin, Burgess & Smith, Chicago, Ill., Walter A. Bates, Arter, Hadden, Wykoff & Van Duzer, Cleveland, Ohio, for defendants.

DECKER, District Judge.

This is a suit for treble damages based upon alleged violations of the Robinson-Patman Act, 15 U.S.C. § 13(a) (the Act). The plaintiff, Loren Specialty Mfg. Co., Inc., is an Illinois corporation which acts as sales representative or distributor for various manufacturers that sell in the Chicago area; the plaintiff conducts certain of its business under the trade name of Meyer-Ekstrom Company.

The defendant Clark Manufacturing Company (Clark) is an Ohio corporation which sells its products in the Chicago area, as well as nationally. Clark manufactures steam specialties, such as steam traps, reducing valves, strainers and separators.[1]

The defendant Robert F. Gleason (Gleason) is a citizen of Illinois who transacts business in Illinois under the name of Gleason Equipment Company. In December, 1955, Gleason was appointed by Clark to be its sales representative for the Chicago area.

The defendant Arnold A. Hanson (Hanson) is a citizen of Illinois who transacts business in Illinois under the name of Industrial Process Equipment Company. In January, 1956, Hanson was hired by Gleason to supervise the Clark account, as well as various accounts in allied lines. In March of 1957, Hanson went into business for himself and succeeded Gleason as the Clark representative for the Chicago area.

Plaintiff argues that, while it was the exclusive distributor for Clark in the Chicago area from 1945 to 1955, it established relationships with many purchasers of steam specialties who purchased from the plaintiff on a regular basis. While the plaintiff was the exclusive distributor, it received a better price from Clark than any other purchaser in its area. However, when Gleason was appointed, the plaintiff no longer received any discount in excess of the distributors' discount, but Gleason received the distributors' discount and an additional discount. It is alleged that Gleason then sold to the plaintiff's previous customers at the same price which the plaintiff was receiving. For this reason, it is alleged, the plaintiff was not only unable to compete with Gleason, but also Gleason intentionally took away the plaintiff's former customers by giving them the same discount as was being given to the plaintiff.

Plaintiff alleges that the defendants violated the Act because Clark sold its products to Gleason and Hanson at lower prices than Clark charged the plaintiff for the same products. Two central issues arise in this case regarding liability. The first is whether there were "sales" to Gleason and Hanson within the meaning of the Act, and the second is, if there were "sales," whether the prices charged Gleason and Hanson represented bona fide functional discounts.

The defendants argue that Gleason and Hanson, called sales representatives, acted as agents for Clark in most of the transactions questioned by plaintiff. They further contend that, even if the Court finds that sales took place, the Court should find that Gleason and Hanson were operating at a different competitive level than the plaintiff in Clark's distributive scheme, so that they were not competitors of the plaintiff, within the meaning of the Act.

---

1. Steam specialties, also called fluid controls, are used industrially in connection with transmitting steam or fluids by pipeline.

On the other hand, the plaintiff argues that the transactions involving Gleason and Hanson were sales, if not in form, then in substance; it contends that Gleason and Hanson were competing on the same level by selling to the same customers that bought from the plaintiff before it lost its exclusive distributorship.

This Court has jurisdiction of the plaintiff's suit based upon the anti-trust laws of the United States, 15 U.S.C. §§ 13, 15, and 28 U.S.C. § 1337.

A trial was held by the Court, sitting without a jury, upon the complaint of the plaintiff. This is being written upon the basis of three days of trial, the evidence adduced therein, as well as posttrial briefs and the proposed findings of the parties.

From the evidence. I make the following specific findings of fact:

1. The plaintiff acted as exclusive distributor in the Chicago area for Clark from approximately 1945 to November, 1955. Clark's prices to plaintiff were stated in terms of the list price minus certain discounts; specifically, the plaintiff purchased Clark products at the distributors' discount, less an additional 10 and 5 per cent.

2. While exclusive distributor for Clark, the plaintiff purchased products from Clark and resold them to its customers. The plaintiff sent its orders to Clark, who then billed the plaintiff; Clark would then send the products either to the plaintiff or to the plaintiff's customer, as the plaintiff directed. The plaintiff billed its own customers and assumed all credit risks.

3. On September 19, 1955, Clark terminated its contract with the plaintiff by giving sixty days' notice as provided by the contract between the plaintiff and Clark; in that letter, Clark offered the plaintiff the opportunity to continue to sell Clark products as a distributor, which the plaintiff accepted.

4. On November 14, 1955, Clark entered into a written agreement appointing Gleason sole sales representative in the Chicago area; the agreement was subject to termination by the notice of either party. The following portions of the agreement are at issue in this litigation:

"We will sell to you at discounts of 10% and 5% from the price to be paid by distributors as determined by our Schedule LP–6551, –2, –3, and –4 now in effect, or from any revision thereof in effect at the time of receipt of your order. You will resell Clark steam specialties so purchased only at the prices and upon the standard terms established by us, unless you first obtain our written consent to sales at different prices or upon different terms.

"On all orders taken by you and billed by us, and on all other orders received from your territory and accepted by us calling for delivery within said territory during the existence of this arrangement, and as full compensation for all of your obligations hereunder, we will, subject to the provision for division of commissions specified following, pay to you the difference between the net price (without deduction of any cash discount) received by us therefrom and the price at which the same goods could have been purchased by you as specified above."

5. A superseding agreement was entered into by Gleason and Clark on April 2, 1956; the two agreements are essentially the same.

6. Gleason hired Hanson in January, 1956, to supervise his Clark account. In March, 1957, Hanson, operating on his own behalf, succeeded Gleason as Clark's Chicago area sales representative. Hanson and Clark operated under an agreement which is essentially the same as Clark used with Gleason.

7. Under the contract, the sales representative was to promote the sale and use of Clark products. The representative was to do the following:

(a) Set up distributors,

(b) Contact specifying engineers and architects,

(c) Contact all potential users, and

(d) Provide service for Clark accounts and products when necessary.

Gleason and Hanson did operate under the terms of the agreement. They called on many potential or present users or sellers of Clark products without regard to whether the customer was a distributor, jobber, retailer, small user, large user, or original equipment manufacturer. They testified that they did not solicit specific orders but merely promoted Clark products by attempting to interest the users and sellers in ordering Clark products. Almost without exception, neither Gleason nor Hanson took an order while at the customer's place of business.

8. After the appointment of Gleason as sales representative, customers' orders were either sent directly to the Clark factory by the customer, or the orders were sent to the sales representative who would forward them to Clark without processing. Clark filled the orders and shipped the goods directly to the customer (or, in some cases where the customer was a distributor, directly to the distributor's customer). Clark billed the customer directly and assumed all credit risks. At the end of each month, Clark sent the sales representative a statement entitled, "Recapitulation of Commissions Paid," and a check for that amount.

9. Neither Gleason nor Hanson were required to carry an inventory of Clark products. Each, however, did purchase certain products from Clark which were used (a) as samples, some of which were given to potential customers, and (b) as a backup stock for distributors or original equipment manufacturers, to enable them to obtain parts more quickly than the parts could be obtained from the Clark factory in Ohio.

10. In December, 1955, Gleason purchased an initial stock of Clark products at a cost of approximately $1,700. Between this time and the time when Hanson succeeded Gleason, Gleason purchased approximately $1,000. worth of additional supplies from Clark. Gleason sold Hanson his remaining inventory, which was worth about $1,000. Subsequently, Hanson sold or gave away this inventory at a rate of not more than $350. a year. Hanson did not purchase more than a nominal amount for his inventory.

11. Except for the initial stock, the approximately $1,000. worth of replacements for inventory which Gleason purchased from Clark, and the nominal purchases which Hanson made, the sales representatives did not take formal title to any Clark products, did not exercise control over any Clark products, and did not pay Clark for any of its products.

12. At the time when the plaintiff was appointed exclusive distributor for Clark, Clark set up certain categories of purchasers to which various discounts could be given. Small users received the least discount, large users and jobbers received the same discount, which was larger than the small users' discount. The distributor received the largest discount, and, in the case of an exclusive distributorship, received an additional 10 and 5 per cent. After the termination of the plaintiff's exclusive distributorship, it received only the distributor's discount. Then Gleason or Hanson received the additional ten and five per cent discount.

Thus, after the appointment of Gleason, if a sale were made directly by Clark to a small user, for instance, Gleason or Hanson would receive compensation in the amount of the difference between the distributor's discount and the small user's discount, as well as their sales representative's discount.

After 1955, while the plaintiff served as a distributor, no one, other than Gleason and Hanson, bought Clark products at a lower price than the plaintiff.

13. After the appointment of Gleason, the plaintiff ceased to be the exclusive distributor and ceased to receive the additional ten and five per cent discount. The classifications of various of the plaintiff's previous customers were changed; some of the plaintiff's previous customers were raised to the status

of distributor and were able to purchase at the same discount as the plaintiff.

14. Paragraph 7 of the complaint alleges that Clark sold its products to Hanson and Gleason, who were in competition with the plaintiff. In separate original answers, the defendants admitted that Gleason and Hanson purchased certain products from Clark.

On May 20, 1964, by agreement of the parties and without objection, the defendants were granted leave to file amended answers to the complaint. In amended answers, the defendants deny that the transactions between Clark and Gleason, and Clark and Hanson, were sales; the defendants set forth facts which are intended to show that the transactions were based upon an agency relationship.

The above findings of fact are all of the facts which relate to whether the character of the transactions fits within the scope of the Act. I shall determine this issue before considering the defense that any greater discount given to Hanson or Gleason was based upon their economic function.

■■ The Act, 15 U.S.C. § 13(a), provides, in part, the following:

"It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, * * * where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce * * *."

Rowe, in his treatise on the Act entitled, Price Discrimination Under the Robinson-Patman Act (1962), states the essential jurisdictional elements of the Act:

"The jurisdictional determination turns on these basic statutory requirements: a discrimination must arise from (A) consummated contemporaneous sales transactions (B) by the same seller to different purchasers, (C) involve 'commodities' of

(D) 'like grade and quality,' and (E) occur 'in commerce.' " (At p. 45)

See also, Castlegate, Inc. v. National Tea Co., 34 F.R.D. 221, 229 (D.Colo.1963). Under the Act, discrimination in price means difference in price. F. T. C. v. Anheuser-Busch, Inc., 363 U.S. 536, 549–550, 80 S.Ct. 1267, 4 L.Ed.2d 1385 (1960).

■ The element of the Act which I must consider is whether and to what extent Clark was a seller to Gleason and Hanson. As the Supreme Court has pointed out in Bruce's Juices v. American Can Co., 330 U.S. 743, 755, 67 S.Ct. 1015, 1021, 91 L.Ed. 1219 (1947) (dictum):

"[N]o single sale can violate the Robinson-Patman Act. At least two transactions must take place in order to constitute a discrimination."

■ It is well settled that a manufacturer may refuse to sell to a particular customer; however, if the manufacturer does sell to buyers who are competitors, he must treat them equally. Shaw's, Inc. v. Wilson-Jones Co., 105 F.2d 331 (3d Cir. 1939); Chicago Seating Co. v. S. Karpen & Bros., 177 F.2d 863 (7th Cir. 1949).

■ Other cases have discussed the meaning of competition as used in the Act. It is most important to note that the manufacturer is not considered to be a competitor; as the Court wrote in Chicago Sugar Co. v. American Sugar Refining Co., 176 F.2d 1, 10 (7th Cir. 1949):

"There is nothing in the Act that prevents a seller of a commodity from eliminating middlemen from its distributive system and selling its commodity directly to consumers if it wishes to do so; and if it chooses it may distribute part of its commodity direct and a part through wholesale distributions."

The problem of whether a given set of transactions involves a sales relationship or an agency relationship has arisen in only a few cases. Those cases do, however, indicate that there is no spe-

cial definition of sale to be applied under the Act, but that the general laws of sale apply to determine whether the relationship of the parties was that of buyer and seller.

In Students Book Co. v. Washington Law Book Co., 98 U.S.App.D.C. 49, 232 F.2d 49 (1955), cert. den. 350 U.S. 988, 76 S.Ct. 474, 100 L.Ed. 854 (1956), the question was whether certain book stores were consignees of the defendant publisher or were buyers from the publisher. The Circuit Court approved a charge[2] that included a definition of "sale" taken from the Uniform Sales Act § 1; see, Ill.Rev.Stat. ch. 121½, § 1 (repealed and superseded by the Uniform Commercial Code, effective July 1, 1962). This definition is:

"A sale of goods is an agreement whereby the seller transfers the property in goods to a buyer for a consideration called the price." Uniform Sales Act § 1(2).

In a recent case brought under the Act, the Court was asked for an order determining whether one of the defendants was a purchaser from the defendant manufacturer. In denying the motion, the court held that a contested issue of fact was presented regarding whether there was a purchase; the court stated:

"[F]or a sale to occur there must be a transfer of title. Dominion and control of the goods seems to be essential in arriving at a determination that a vendor-purchaser relationship exists.[3]

\* \* \* \* \* \*

"In a somewhat different context under the Robinson-Patman Act, but where the issue was the existence of a seller-purchaser relationship, the court indicated that the lack of do-

minion or control between the parties is the critical test in determining whether the relationship existed, and set forth many of the factors necessary to such a determination. Western Fruit Growers Sales Co. v. F. T. C., 322 F.2d 67 (9th Cir. 1963)." Reines Distributors, Inc. v. Admiral Corp., Trade Reg. Rep. (1964 Trade Cas.) ¶ 71,047, at 79,142 (S.D.N.Y. Mar. 10, 1964).

Finally, various factors for determining whether a relationship is one of sale or of agency are set out in Mathews Conveyor Co. v. Palmer-Bee Co., 135 F.2d 73 (6th Cir. 1943). This case was brought by a manufacturer against its previously appointed "exclusive sales agent and representative \* \* \* for the State of Michigan." 135 F.2d 73, 77. The plaintiff complained that the defendant violated its agency agreement by selling its own machinery to a customer, rather than the plaintiff's equipment. The Court found that the agreement was not an agency contract, but was a contract of sale. Certain indicia of sale were considered and applied to the transactions in question; the Court stated, 135 F.2d at page 81:

"From a consideration of the evidence and a review of the foregoing cases, we arrive at the conclusion that the contract was one of sale and not of agency. The products were bought outright from plaintiff by defendant. The latter dealt directly with its own customers in securing orders, and in delivering and installing the equipment. It billed such customers in its own name, assumed all credit risks for payment, and, having obtained full title to the goods, exercised complete control over them, including installation and erection, as well as assuming all

---

2. On this point, the charge to the jury was the following: "Now what is a sale and what is a consignment? A sale of goods is an agreement whereby the seller transfers the property in goods or the owner [sic] of the goods to the buyer for a consideration called the price." 232 F.

3. See also, Standard Fashion Co. v. Magrane-Houston Co., 258 U.S. 346, 42 S.Ct. 360, 66 L.Ed. 653 (1922), where the Court said: "Full title and dominion passed to the buyer. While this contract is denominated one of agency, it is perfectly apparent that it is one of sale." (At p. 354, 42 S.Ct. at p. 361.)

liability incidental thereto. It engaged on its own behalf in procuring business for plaintiff's products and carried on its own business for itself, and not for plaintiff."

■ Before applying the law to the facts, a threshold problem must be discussed. The plaintiff argues that the defendants should be estopped from denying that sales were made, because the defendants' original answers admitted that some sales had been made. The amended answers denied that any sales were made. Although the original answers are superseded as pleadings, the plaintiff can still seek to offer the original answers as admissions; however, for the Court to consider the originals as admissions, these answers must be offered into evidence, which is not the case here. IV Wigmore, Evidence, § 1067; Fruco Const. Co. v. McClelland, 192 F.2d 241, 245 (8th Cir. 1951); Nisbet v. Van Tuyl, 224 F.2d 66, 71 (7th Cir. 1955). Furthermore, even if the original pleading is offered into evidence, the court may still disregard it; in Decatur Coal Co. v. Clokey, 332 Ill. 253, 259–260, 163 N.E. 702, 704 (1928), the Court said:

> "As a matter of law, when an admission is made in a pleading at law or in chancery, if improvidently made through mistake and contrary to the actual fact, the court may, upon a proper showing, permit the pleader to change his pleading to conform to the fact."

■ For the above reasons, under the circumstances of this case, I hold that the defendants are not estopped from denying that sales were made by reason of their original answers.

■ The important facts concerning Clark's relationship with Hanson and Gleason can now be considered. The contract itself shows that the parties contemplated operation under either a vendor-vendee relationship or a principal-agent relationship, depending upon how a particular transaction was handled. The contract, then, is not determinative of the issue.

Inspecting the facts of the transactions that the defendants denominate as agency transactions, contrasted to direct sales from Clark to Gleason or Hanson, the following factors appear:

(a) Title to the goods never formally passed to Hanson and Gleason;

(b) Most orders were sent directly to the factory by the customer; Gleason and Hanson took almost no orders themselves and forwarded those which were sent to them to Clark;

(c) All billing was done by Clark;

(d) All credit risks were assumed by Clark; and

(e) All shipping of goods was done by Clark.

From the foregoing facts, I hold that these transaction were not sales of goods by Clark to Gleason or Hanson within the legal meaning of "sale."

Nevertheless, the plaintiff argues that it does not matter whether title passed in the technical sense. Plaintiff points out that Gleason or Hanson would receive the same amount of profit whether or not they actually took title to the goods. Plaintiff states its position as follows:

> "There is no doubt that Gleason, and later Hanson, attained 'the status of a competing purchaser under the Act' even if they did not take title to the Clark products. They, not Clark, competed with the plaintiff, they took away plaintiff's customers by means of the lower prices Clark gave them, and they profited by the difference between the cost Clark charged them and the selling price.
>
> "This was equally true whether the title passed through Gleason or Hanson or whether it did not, and the choice, as Hanson admitted, * * * was for him to make. Certain it is that plaintiff did not lose less money because Hanson chose in any given case, to have Clark convey the title direct to the ultimate user instead of to Hanson." (Reply Brief, pp. 12–13.)

The plaintiff further exhorts the Court to "disregard technicalities and [to] look to the substance rather than form * *." (Reply Brief, p. 11.)

 I agree with the plaintiff that the *mere* form of a transaction does not determine whether the Act applies. Plaintiff has cited several cases under the Act which stand for the proposition that the Act can apply to an "indirect purchaser." The plaintiff concedes that the cases are not factually comparable with the case at bar. Moreover, an examination of the cases reveals that the quotations which the plaintiff has provided are misleading and are out of context. In K. S. Corp. v. Chemstrand Corp., 198 F.Supp. 310 (S.D.N.Y.1961), and American News Co. v. F. T. C., 300 F.2d 104 (2d Cir. 1962), cited by the plaintiff, the question arose whether certain purchasers that were competing with the plaintiffs purchased from the manufacturers, even though the manufacturers dealt by means of intermediaries, such as wholesalers. The Court in American News Co. v. F. T. C., supra, stated:

"If the manufacturer deals with a retailer through the intermediary of wholesalers, dealers, or jobbers, the retailer may nevertheless be a 'customer' or 'purchaser' of the manufacturer if the latter deals directly with the retailers and controls the terms upon which he buys." 300 F.2d 104, 109.

The contrast between these cases and the case at bar is that, in the above cases, there was no question that purchases were made; the question was *from whom* were the purchases made. In the case at bar, the vital question is whether Gleason and Hanson were *purchasers,* because it is evident that no one other than Hanson and Gleason could have received a better price than the plaintiff.

Perhaps, vis a vis the plaintiff, there is no difference whether the sales representatives were purchasers or agents; nevertheless, the relationship between Clark and the sales representatives was crucial to them. Under Clark's agreement with the sales representatives, when orders were sent to the factory, Clark was to bear and did bear all risk of loss while the goods were in transit and all risk of loss resulting from credit transactions. In these transactions, it was Clark's absolute right to control the goods. Should there be a customer complaint or a negligence suit, Clark would bear responsibility and not the sales representatives. Under these circumstances, Gleason and Hanson were not purchasers within the provisions of the Act.

 Regarding the transactions that were direct sales from Clark to Gleason and Hanson, it is clear that this was but a small part of the defendants' business. There is no proof in the record that two contemporaneous sales were made at discriminatory prices; therefore, the Act's requirements have not been met, and damages cannot be founded upon these sales.

For the above reasons, the complaint must be dismissed, and the defendants granted their costs in this action.

It is hereby ordered that the plaintiff's complaint be, and is, dismissed, and that costs be taxed against the plaintiff and for the defendants.