**SUN OIL COMPANY, Petitioner,**

v.

**FEDERAL TRADE COMMISSION,**
Respondent.

No. 17658.

United States Court of Appeals
Fifth Circuit.

July 24, 1961.

466

Henry A. Frye, Philadelphia, Pa., H. P. Osborne, Jr., Jacksonville, Fla., Leonard J. Emmerglick, Washington, D. C., Richard L. Freeman, Philadelphia, Pa., Perlman, Lyons & Emmerglick, Washington, D. C., Moffett, Frye & Leopold, Philadelphia, Pa., Osborne, Copp, Markham & Ehrlich, Jacksonville, Fla., of counsel, for petitioner.

James E. Corkey, Asst. Gen. Counsel, Alan B. Hobbes, Francis C. Mayer, Washington, D. C., Daniel J. McCauley, Jr., General Counsel, Ralph S. Cunningham, Jr., Attorneys for Federal Trade Commission, Cambridge, Mass., for respondent.

Before JONES, BROWN, and WISDOM, Circuit Judges.

WISDOM, Circuit Judge.

This controversy between Sun Oil Company, petitioner, and the Federal Trade Commission was generated by a price battle between two filling stations. The issues relate to an alleged secondary-line price discrimination violative of the Robinson-Patman Act, 15 U.S.C.A. § 13–13b, 21a and the Federal Trade Commission Act, 15 U.S.C.A. § 41 et seq. The key question is whether the defense of meeting competition in good faith is available to a supplier of gasoline when the supplier reduces the wholesale price of its gasoline to one of its filling stations engaged in a price battle at the consumer

level with a station owned and operated by a competing supplier. We hold for the petitioner.

Sun, a major oil company, refines, sells, and distributes gasoline throughout the United States. It sells only one grade, Blue Sunoco. In 1955 Gilbert McLean, one of Sun's thirty-eight retail dealers in Jacksonville, Florida, operated a filling station on the corner of 19th and Pearl streets in Jacksonville.[1] McLean was an independent contractor[2] but, like virtually all filling station operators, he sold gasoline purchased from only one supplier. He bought gasoline from Sun Oil Company at 24.1 cents a gallon and sold it at 28.9 cents a gallon, then the prevailing price in the Jacksonville area for gasoline sold under a major supplier's brand. Late in June 1955 Super Test Oil Company, a "non-major"[3] competitor of Sun's, opened a filling station across the street from McLean's station and began selling Super Test "regular" gasoline at 26.9 cents a gallon, then the prevailing price in Jacksonville for off-brand gasoline. McLean testified that he was not hurt competitively as long as the differential between Sunoco and Super Test was two cents.[4] In August the Super

1. Sun divided Jacksonville into three sales territories. McLean and seven other dealers were located in the territory consisting roughly of the north one-third of Duval County. The examiner found that the pattern of traffic flow in this sales territory was such that motorists traveling from northern and northwestern Duval County to the downtown Jacksonville area had ready access to all of these stations.

2. "Service stations today may be divided into five groups and the number in each roughly estimated as follows: (1) over 3,000 owned by suppliers and run by salaried managers; (2) about 8,000 of the new and rapidly growing 'commission-type' stations run as independent businesses except that they buy their gasoline on consignment, thus giving the supplier control over prices; (3) some 90,000, more or less, which are leased by the supplier—usually a refiner, but often a jobber and occasionally the owner of a chain of stations—to the operator, subject to cancellation for unsatisfactory performance; (4) perhaps 15,000 or 20,000 leased by the dealer from a third party; and (5) the remaining 60,000 or so which are on land and premises owned by the dealer himself. Types (4) and (5) are the 'independent' or 'contract' stations whose operators merely buy their gasoline, and usually other products, on contract from their suppliers." Whitney, 1 Antitrust Policies—American Experience in Twenty Industries 125 (Twentieth Century Fund, N.Y.1958).

3. The line between a "major" and a "non-major" oil company or "independent" is not well-defined. A major oil company is usually integrated in that it operates on the four functional levels of production, transportation, refining, and mar-

keting. Generally, a non-major does not own its refinery, or if it does, the refinery is usually small. The non-major usually owns and operates its filling station. The off-brand gasoline a non-major sells has a lower octane rating than a name-brand gasoline. Super Test had an octane rating of 87.5 as against Sunoco's rating, in 1955, of 92.5. There are about twenty vertically-integrated but not self-contained majors.

4. "Private brands generally come to rest at a differential around 2 cents at retail below major brands." de Chazeau and Kahn, Integration and Competition in the Petroleum Industry 466 (Yale U.Press, 1959). In a case study of a price war in Philadelphia the author states, "The Sun management believed that a branded gasoline could effectively compete with a non-branded gasoline which sold for only one to two cents less." Comment, Competition in Gasoline Retailing: A Price War, 101 U. of Pa.L.Rev. 643, 645 (1953). In the instant case the Sun official in charge of market research testified that it was not unusual to find markets where the differential is only one cent; that in a sub-normal market, such as a price war, the pattern has been for the majors to post prices within one cent of the non-majors. The examiner regarded this as evidence of predatory pricing to whip non-majors into line; Sun insists that the dealer posts whatever price he chooses, and that in a price war a dealer tries to protect himself by posting a price with a one cent differential. The determination of a sound differential is made more difficult when, as in the instant case, the non-major gives trading stamps. Sun officials regard such a practice as equivalent to a further reduction of one cent in the price of gasoline.

Test station commenced a series of price cuts which were advertised on curb signs in front of the station and also in the newspapers. August 27 Super Test dropped its posted price to 21.9 cents a gallon and August 28 dropped its price to 20.9 cents a gallon. Then and later, whenever Super Test cut its prices McLean's sales declined substantially.[5] On a number of occasions, after reducing prices and gaining customers at McLean's expense, Super Test reestablished the customary two-cent price differential between its gas and Sunoco. On at least one occasion Super Test maintained its low price for a week.

McLean and Super Test competed for gallonage with McLean always the loser. He was a sitting duck. Super Test, a vertically-integrated company [6] operating its

5. The monthly gallonage was:

| | McLean | Super Test Regular | Super Test Premium |
|---|---|---|---|
| June, 1955 | 7,145 | ... | ... |
| July, 1955 | 7,466 | 5,047 | 1,329 |
| August, 1955 | 6,735 | 15,300 | 4,292 |
| September, 1955 | 6,400 | 10,694 | 2,693 |
| October, 1955 | 6,495 | 10,925 | 2,648 |
| November, 1955 | 5,946 | 11,066 | 2,398 |
| December, 1955 | 8,368 | 18,906 | 3,954 |
| January, 1956 | 32,115 | 61,672 | 7,890 |
| February, 1956 | ..... | 67,156 | 8,520 |

McLean's December and January figures reflect the increase in sales after Sun's allowance of 1.7 cents on December 27, 1955. McLean's daily sales in February 1956, until he went out of business February 18, averaged about the same as January sales.

On August 26, 1955, when Super Test's regular gas was posted at 26.9, its station sold 127 gallons plus 21 gallons from the truck pump; on August 27, when the price dropped to 21.9, the station sold 3,583 gallons plus 263 from the truck pump, and 1324 of ethyl (at 23.9). On August 28, when the price was cut to 20.9 for the regular, Super Test sold 4931 gallons plus 278 from the truck pumps, and 1611 gallons of ethyl. On August 29, when the Super Test price went up again to 26.9 and 28.9, the station sold 408 gallons of the regular plus 38 from the truck pump, and 137 gallons of ethyl.

❖

6. "All of the largest companies and many of the smaller ones are integrated vertically. Though the physical flow of oil from well to user may be almost continuous, the sequence of operations traditionally falls into a number of broad categories * * * Vertical integration occurs when the activities of a single company span two or more of these stages." de Chazeau & Kahn, Integration and Competition in the Petroleum Industry, p. 19 (Yale U.Press, 1959). Vertical "integration appears in many contexts"; it is "the combination under single ownership of successive stages in a particular cycle of production." Rostow, Entry into the Oil Refining Business; Vertical Integration, 61 Yale L.J. 856, 860, 878 (1952). For a comprehensive study of integration in the petroleum industry, in addition to de Chazeau and Kahn, see McLean and Haigh, The Growth of Integrated Oil Companies (Boston, Harvard Business School, 1954).

"During the 1920's the major oil companies expanded their direct operation of service stations; but retail price cutting after 1929 began to reveal weaknesses in this policy. Independent stations took business away from company stations because they could cut prices on shorter notice, with less risk of ill will, and without violating the Clayton Act or oneprice laws in a number of states. Between 1933 and 1934 the number of stations owned by eighteen majors was reduced from 125,327 to 98,246, and by 1935 it was only 75,547. The new factor which became effective in 1935 was Iowa's severe tax on chain stores, including stations. Standard of Indiana at once leased out to their operators all its stations in the state, and this 'Iowa plan' quickly spread to other refiners and other territories. Besides escaping the chain store tax, which seven states had adopted at the end of 1939, the refiners were glad to be relieved of responsibility for

own filling stations, could fix any retail price it pleased; McLean's price to the public was dependent on Sun's price to him. The Examiner found that McLean made it clear to Sun that unless something could be done to meet the Super Test competition he would be forced out of business. In the four months following Super Test's August "Grand Opening Special" McLean repeatedly asked Sun to reduce its wholesale tank-wagon price to him to a level that would allow Sunoco to compete with Super Test. Sun carefully considered the situation, but for four months gave no price allowance to McLean.

The week-end of December 3, 1955 Super Test dropped its price to 21.9 cents a gallon. A few days later the price went up again but after a short lull, with Sunoco still at 28.9 cents a gallon and Super Test at 26.9 cents a gallon, Super Test dropped its price to 24.9 cents a gallon. This was the last straw. McLean told Sun's regional manager that he was going out of business. The manager reported to his home office that the situation was "desperate." McLean informed the manager that to meet the competition he would have to post a price of 25.9 cents a gallon, but he could not afford to do so unless Sun gave him some relief. He followed this with a request by letter for assistance that would enable him to

sell at 1.8 cents a gallon above the posted dealer tank-wagon price of 24.1 cents a gallon.[7] December 27, 1955, Sun gave a discount to McLean of 1.7 cents a gallon.[8] Sun reached this decision after a study of gallonage records of its Jacksonville dealers and a report from its regional manager, familiar with the local situation, led it to conclude that only McLean was affected adversely by Super Test's price-cuts and a price allowance could be made to McLean to put Sunoco on a competitive level with Super Test at 19th and Pearl streets without adversely affecting any other Sun dealer in Jacksonville. McLean cut his price three cents, to 25.9 cents, thereby absorbing 1.3 cents of the cut and reducing his normal gross profit from 4.8 cents to 3.5 cents. Sun officials and McLean testified that there was no agreement or understanding to fix his retail price. The Examiner found, however, that there was such an agreement. The next day or one day thereafter Super Test reduced its price to 23.9 cents, reestablishing the 2-cent differential. McLean maintained his price at 25.9 cents and kept it there until he went out of business. Shortly after Sun reduced its tank-wagon price to McLean, other dealers in the Jacksonville area complained about not being given the same allowance.[9] Then, February 16, 1956, what had been a skirmish on the corner of 19th

service station employees, who were now being organized into unions and covered by social security and wage and hour legislation.

"The number of refiner-operated stations continued to decline, amounting to only about 3,000 [less than 2%] in 1956. Although some majors still keep a core of salaried dealers, most of them have retained only a few selected locations to use as models or experimental and training plants, and for the profit of their concentrated, high-volume sales." Whitney, 1 Antitrust Policies 125 (1958). Here, Sun's integration stopped short of retailing through company-owned stations.

7. The letter, dated December 27, 1955, read, in accordance with a company form: "Please be advised that I am confronted with a depressed retail gasoline price situation which has affected my business

\* \* \* In order to meet this competition, it will be necessary for me to sell Blue Sunoco gasoline at a retail service station price that is 1.8 cents per gallon above the posted dealer tankwagon price at which I now purchase same under my Dealer's Agreement.

"Therefore, I am requesting assistance from you to help me in meeting these competitive conditions."

8. Sun's policy is to make certain that an operator grosses at least 3.5 cents a gallon. Sun considers this the minimum margin on which a dealer can exist. 3.5 is 1.3 cents less than McLean's usual profit of 4.8 cents. Since McLean elected to reduce his posted price to 25.9 cents a gallon, a drop of 3 cents, it was requisite that the company allow 1.7 cents in order for him to gross 3.5 cents.

9. Four of the seven other Sun dealers in the same sales territory as McLean testi-

and Pearl became a full-scale price war in the Jacksonville area. February 16 Super Test lowered its price to 22.9 cents for its regular gasoline and 25.9 cents for ethyl. Then, after several major suppliers reduced their tank-wagon price, Sun dropped its tank-wagon price to all of its dealers in the area.

Sun's price allowance to McLean on December 27, 1955, came too late to help him. February 18, 1956, he went out of business. It was just as well; February 28, Super Test cut its regular gasoline to 19.9 cents and its ethyl to 22.9 cents.

September 28, 1956, the Federal Trade Commission filed a complaint against Sun charging it with having violated Section 2(a) of the Clayton Act, as amended by the Robinson-Patman Act,[10] by selling gasoline to McLean at a lower price than Sun charged other retail dealers in the same market area. In defense, Sun asserted that the allowance to McLean was a good faith price reduction to meet competition, as permitted under Section 2(b) of the Robinson-Patman Act. The complaint charged also that Sun violated Section 5 of the Federal Trade Commis-

sion Act by conspiring with McLean to fix the retail price of Sunoco at McLean's station.[11] Sun denied this charge. The Commission, adopting in full the Hearing Examiner's findings and conclusions, issued a broad order against Sun, directing it to cease and desist from discriminating in prices; the order applies not only to the sale of gasoline but also to the sale or distribution of any Sun products. On Sun's petition to review and set aside the Commission's cease and desist order, we grant review and set aside the order.

## I.

◼ The Commission contends that the defense of meeting competition is available to a seller only to meet direct competition for the business of his customer; that Sun could reduce its price to McLean only if Super Test offered gasoline to McLean at prices cheaper than Sunoco. Here, however, so the Commission argues, the seller granted a price deduction to a favored dealer in order to help *that* dealer meet his retail competition.[12] Respect for a federal agency's

---

fied. The Examiner found that these dealers were in substantial competition with McLean and that they were competitively injured by the price allowance granted McLean.

10. 49 Stat. 1526 (1936), 15 U.S.C.A. §§ 13–13b, 21a, Section 2(a) provides: "[I]t shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce, where such commodities are sold for use, consumption, or resale within the United States or any Territory thereof or the District of Columbia or any insular possession or [any] other place under the jurisdiction of the United States, and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with the customers of either of them: *Provided*, That nothing herein contained

shall prevent differentials which make only due allowance for differences in the cost of manufacture, sale, or delivery resulting from the differing methods or quantities in which such commodities are to such purchasers sold or delivered * * *"

Section 2(b) provides: "Upon proof being made, at any hearing on a complaint under this section, that there has been discrimination in price or services or facilities furnished, the burden of rebutting the prima-facie case thus made by showing justification shall be upon the person charged with a violation of this section, and unless justification shall be affirmatively shown, the Commission is authorized to issue an order terminating the discrimination: *Provided*, however, That nothing [herein] contained shall prevent a seller rebutting the prima-facie case thus made by showing that his lower price * * * to any purchaser * * * was made in good faith to meet an equally low price of a competitor * * *."

11. 38 Stat. 719 (1914) as amended by 52 Stat. 111 (1938), 15 U.S.C.A. § 45.

12. The hearing examiner stated merely that "the proviso in Section 2(b) has reference to the good faith meeting of

unquestioned expertise does not require the Court to abdicate its judicial responsibility of construing the statute in the factual setting, strongly as counsel for the Commission argues that the weight to be given the facts and inferences is for the Commission.[13] We consider the Commission's construction of the Act unnecessarily narrow, unrealistic in terms of the facts of life in marketing gasoline, and inconsistent with the purposes of the Robinson-Patman Act.

██ Section 2(a) of the Robinson-Patman Act requires a seller to charge uniform prices to competing purchasers; proof of a price discrimination establishes a prima facie violation of Section 2(a). "[A] price discrimination within the meaning of that provision is merely a price difference." Federal Trade Commission v. Anheuser-Busch, Inc., 1960, 363 U.S. 536, 80 S.Ct. 1267, 1274, 4 L.Ed. 2d 1385. However, as the Seventh Circuit pointed out in Anheuser-Busch on remand; the "Supreme Court, at page 553, 80 S.Ct. at page 1277, disclaimed any flat prohibition of price differentials, recognizing that price differences constitute but one element of a § 2(a) violation". Anheuser-Busch, Inc. v. Federal Trade

Commission, 1961, 289 F.2d 835, 836. Other parts of the statute allow price reductions which meet established criteria; the Act clearly "places emphasis on individual competitive situations".[14]

██ Section 2(b), on which Sun relies, allows a seller, in an individual competitive situation, to rebut a prima facie violation of Section 2(a) by showing that his "lower price * * * was made in good faith to meet an equally low price of a competitor". This proviso creates a substantive defense or "justification" that overrides the importance of any competitive injury and is absolute in nature.[15] The Section 2(b) defense raises a question of fact in each case as to whether the competition justifies the discrimination.[16]

In holding the defense of meeting competition inapplicable, the Examiner and the Commission relied on Enterprise Industries, Inc. v. Texas Co., D.C.Conn. 1955, 136 F.Supp. 420, 421, reversed on other grounds, 2 Cir., 1957, 240 F.2d 457, cert. den., 1957, 353 U.S. 965, 77 S.Ct. 1049, 1 L.Ed.2d 914. There is no other reported case directly in point.[17]

In Enterprise the plaintiff operated a Texaco station selling gasoline purchased

competition of the seller, and not the competition of the buyer as in this case." The Commission opinion simply states: "The discount given by respondent to McLean was not made to meet a lower price made to the latter by another supplier. It was given to enable McLean to meet the competition of the Super-Test station across the street. Respondent would justify broadening the proviso of Section 2(b) to cover this situation on the theory that respondent and its dealer McLean were, in fact, competing as a unit with other channels of competition. As pointed out by the hearing examiner, this agreement goes beyond the plain wording of the proviso which has reference to the good faith meeting of competition of the seller, rather than that of the buyer."

13. See footnote 42. See Comment, The New Federal Trade Commission and the Enforcement of the Antitrust Law, 65 Yale L.J. 34, 81–85 (1955). See also Schwartz, Legal Restriction of Competition in the Regulation Industries: An Abdication of Judicial Responsibility, 67 Harv.L.R. 436, 471–475 (1954).

14. Federal Trade Commission v. A. E. Staley, 1945, 324 U.S. 746, 753, 65 S.Ct. 971, 975, 89 L.Ed. 1338.

15. Standard Oil Co. v. Federal Trade Commission, 1951, 340 U.S. 231, 71 S.Ct. 240, 95 L.Ed. 239.

16. "Prior to the Robinson-Patman amendments, § 2 of the Clayton Act provided that nothing contained in it 'shall prevent' discriminations in price 'made in good faith to meet competition.' The change in language of this exception was for the purpose of making the defense a matter of evidence in each case, raising a question of fact as to whether the competition justified the discrimination. See the Conference Report, H. Rep. No. 2951, 74th Cong. 2d Sess. pp. 6–7; see also the statement of Representative Utterback, the Chairman of the House Conference Committee, 80 Cong.Rec. 9418." Federal Trade Commission v. Staley Mfg. Co., 1945, 324 U.S. 747, 752, 65 S.Ct. 971, 974, 89 L.Ed. 1338.

17. The Commission filed complaints in two actions that are similar to the complaint filed against Sun. Both these matters

only from the defendant, Texas Company. The plaintiff's station, near Hartford, Connecticut, on a well-traveled interstate highway, competed with other stations on the highway for the business of transient motorists, and it also competed for local business with nine stations off the highway selling Texaco. Hartford gas stations were in a price war. Texas Company, under the spur of declining sales, made price allowances to both local and highway Texaco dealers in the gas war area on condition that they match (but not undercut) the prices of their competitors selling rival brands. The amount of the allowance depended on the prevailing neighborhood price. The price in Hartford was lower than it was on the highway, so that Texas Company sold to its Hartford dealers at a lower price than it sold to the plaintiff. The plaintiff sued for treble damages for price discrimination under Section 2(a). The district court rejected the meeting competition defense, holding that by granting a price differential between purchasers who competed with each other Texas Company violated Section 2(a) of the Robinson-Patman Act.[18] The district court stated:

"Moreover, Texas could justify discrimination only by a showing

that it dropped its price to the other stations to meet an equally low price made available to those other stations by a competing oil company. In view of the short term station and equipment leases in effect with some stations, perhaps it is a fiction to speak of price competition at the oil company sale to the station level. That is the competitive level at which the justification is provided for defendant in the Act, however. The Act does not go so far as to allow discriminatory price cutting to enable a buyer to meet price competition, but only to enable the seller to meet a lawful price of the seller's competitor." 136 F.Supp. 421.

■ The district court was fully aware of the unreality of its approach, as is evident from the court's admission that it is a "fiction to speak of price competition at the oil company sale to the station level"; a filling station operator carrying a brand-name gasoline does not buy from several competing oil companies.[19] Inherent in the court's conclusion, and in the position of the Commission in this case, is the notion that although a supplier's product competes with the products of other suppliers for

---

are still pending before the Commission. The Pure Oil Co., F. T. C. Dkt. 6640 (1956); The Texas Co., F. T. C. Dkt. 6898 (1957).

18. In Enterprise the district court pointed out that the burden was on Texas Company to prove the price of its competing refiner. There was no evidence of such price and none that the Texas Company's prices were not *lower* than its competitors. Further, there was no evidence that the prices of the competitors were lawful prices. The defense of meeting competition failed on these grounds. The district court did not rule on whether a supplier was meeting *his* competition in giving an allowance to a dealer who also had competition to meet. That was not the case before it.

On appeal the Second Circuit did not reach the substantive issue, dismissing the case on the ground that the plaintiff had failed to prove the amount of its injuries. Nevertheless, Judge Hand, organ of the Court, seemed to take it for grant-

ed that the supplier's action was the natural and lawful response to a price raid from a competitor. He said:

"It is not uncommon in the industry for a filling station to start what has come to be known as a 'gas war'; that is, to cut the prevailing price of gasoline, which other competing stations must meet by a corresponding cut in order to keep up their sales; and that makes it important * * * for the producing companies to reduce their prices to their own competing stations." 240 F.2d 457, 458.

19. W. W. Wright, 35 years with Sun, Sales Manager and Vice-President of Sun, testified: "I would say all gasoline is sold to the public through stations operating or handling one brand of gasoline."

"Although the Standard Stations and Richfield cases dealt primarily with exclusive dealing in gasoline, there is in fact little future in the attempt to have stations handle more than one brand.

the motorists' trade a supplier is not in competition at the consumer level—even with a supplier-retailer; or, if he is, the Act ignores it. Thus, if Super Test had attempted to increase its share of the market by offering its gasoline to McLean at a price under Sun's price, the Commission—so it says in regard to such an unusual situation—would have allowed Sun to meet the competition by reducing its prices to McLean. Yet Super Test accomplishes the same purpose by undercutting McLean, and the Commission gives its blessing to the practice. The Commission would have Sun sit and watch Super Test squeeze McLean out of business and take over Sunoco customers at 19th and Pearl. A result so extreme mocks the principle, "The heart of our * * * economic policy long has been faith in the value of competition"; "Congress did not seek by the Robinson-Patman Act either to abolish competition or so radically to curtail it that a seller would have no substantial right of self-defense against a price raid by a competitor". Standard Oil Co. v. Federal Trade Commission, 340 U.S. 231, 248, 71 S.Ct. 240, 249, 95 L.Ed. 239.

To our way of thinking, the court's approach in Enterprise, and the Commission's doctrinaire approach here are inconsistent with the view of gasoline marketing taken in the "Detroit" opinion, Standard Oil Company v. Federal Trade Commission, 1951, 340 U.S. 231, 71 S.Ct. 240, 95 L.Ed. 239.[20] Standard Oil of Indiana, to meet a competitor's price, sold gasoline to four wholesalers, jobbers, in the Detroit area at a lower price than it charged its retail dealers. The jobbers passed on this saving to their customers who were able to undercut retail dealers buying directly from Standard Oil. The Commission took the position that Section 2(b) merely allowed rebuttal of a prima facie case, and was not a substantive justification of an otherwise unlawful price discrimination. The Supreme Court held that Section 2(b) good faith defense was absolute even though a substantial lessening of competition might result, and remanded the case to allow Standard "to show that its lower price to each jobber was made in order to retain that jobber as a customer and in good faith to meet an equally low price offered by one or more [of its] competitors." 340 U.S. 231, 236, 71 S.Ct. 240, 243, 95 L.Ed. 239. The case is distinguishable on the facts, but the Court was acutely aware of the interaction of competition at various levels and recognized the validity of the defense even though the price differential would have an injurious effect on competition among the supplier's dealers and the dealers' purchasers:

"It must have been obvious to Congress that any price reduction to any dealer may always affect compe-

'Split pump stations,' as they were called, were formerly quite common, but defects of the system caused most of them to disappear. As early as 1931 two surveys showed 85 and 95 per cent of motorists expressing themselves as opposed to it, primarily out of fear that the dealer would substitute the second brand for the desired one. Not only did dealers find that handling one brand required less investment and less bookkeeping, but six out of seven felt that it actually increased sales. As to suppliers, they naturally dislike operating through dealers whose lack of special enthusiasm for their own brand is obvious to the customer.

"In bringing the Standard Station suit, the Department of Justice probably had in mind elimination of exclusive dealing in motor oil and TBA as much as or more than in gasoline." 1 Whitney 126, op. cit.

20. "The canons of construction applied by the Supreme Court in the 1951 'Detroit' opinion are the direct antithesis of those employed by the District Court in Enterprise." Steed, Antitrust Problems Under Price War Conditions, Southwestern Institute on Antitrust Laws, 77, 100 (1958). (It should be pointed out that Steed is an attorney for the Texas Company).

"The Enterprise view of the good faith defense is in sharp contrast with that expressed by the Supreme Court in Standard Oil Co. v. FTC." Note, The Good Faith Defense of the Robinson-Patman Act, 66 Yale L.J. 935, 938 (1957).

tition at that dealer's level as well as at the dealer's resale level, whether or not the reduction to the dealer is discriminatory. Likewise, it must have been obvious to Congress that any price reductions initiated by a seller's competitor would, if not met by the seller, affect competition at the beneficiary's level or among the beneficiary's customers just as much as if those reductions had been met by the seller." 340 U.S. 231, 250, 71 S.Ct. 240, 250, 95 L.Ed. 239.

The "actual core of the defense," the Supreme Court stated, "still consists of the provision that whenever a lawful lower price of a competitor threatens to deprive a seller of a customer, the seller, to retain that customer, may in good faith meet that lower price." 340 U.S. 231, 242, 71 S.Ct. 240, 245. Here, there is no doubt that Super Test's prices threatened "to deprive" Sun of McLean as a customer. They did in fact deprive Sun of McLean as a customer. And they deprived Sun of sales, through McLean, to the motoring public. "Clearly, a seller's need for a lower price in response to a decrease in his sales is the same whether the decrease occurs because his purchasers switch to a price cutting competitor or because [his purchasers] are unable to protect their share of the retail market from distributors of a rival product." [21]

■ In the instant case the Commission shows a proper solicitude for other Sun stations in McLean's sales territory. Sun denied that these stations suffered any substantial loss of business attributable to McLean. The Examiner found that four of these stations suffered a loss

of trade, although they were located at distances of somewhat less than a mile to three and a half miles from 19th and Pearl streets and it would seem impossible to say whether they suffered a substantial loss of gallonage from Sun's price allowance to McLean or from Super Test's aggressive price cutting. But if the good faith defense is to have meaning *when applied to a supplier in competition with a supplier-retailer*, it must be recognized that some dealers may suffer a diversion of business when the supplier lowers its price to meet competition. This result is consistent with the theory of the Robinson-Patman Act in the light of national policy as expressed in the Sherman Act, 15 U.S.C.A. § 1 et seq. The two statutes must be reconciled—if possible.[22] National policy favors consumers and the competitive process. Consumers favor the benefits of competition—not the benefits of buying from particular merchants. Thus, the Attorney General's National Committee to Study the Antitrust Laws, emphasizes that the Robinson-Patman Act focuses on "the vigor of competition in the market rather than hardship to individual businessmen. * * * Incidental hardships on individual businessmen in the normal course of commercial events can be checked by a price discrimination statute only at serious risk of stiffling the competitive process itself."[23] Taking a coldly objective view of this case, one would have to say that, regardless of some injury to certain Sun dealers, Super Test's price-cutting and Sun's response of making an allowance to McLean benefitted consumers and the competitive process in at least two ways: by promoting competition at the retail level and by

---

21. Note, The Good Faith Defense of the Robinson-Patman Act: A New Restriction Appraised, 66 Yale L.J. 935, 939, (1957). See also Casady & Jones, The Nature of Competition in Gasoline Distribution at the Retail Level 79–92, 122–138 (1951).

22. "It is our duty to reconcile such interpretation [of the Robinson-Patman Act], except where Congress has told us not to, with the broader antitrust policies

that have been laid down by Congress." Automatic Canteen Co. of America v. Federal Trade Commission, 1953, 346 U.S. 61, 74, 73 S.Ct. 1017, 1024, 97 L.Ed. 1454.

23. Report of Attorney General's National Committee to Study Anti-Trust Laws, 164–165 (1955). See also Anheuser-Busch v. F.T.C., 7 Cir., 1959, 265 F.2d 677.

providing an opportunity for a major to break away from a uniform pricing system [24] characteristic of an oligopolistic [25] industry such as the oil industry.

For precedent, the Commission relies solely on Enterprise. Sun, aside from the Standard Oil decision, finds aid and comfort in Balian Ice Cream Co. v. Arden Farms, 9 Cir., 231 F.2d 356, certiorari denied 350 U.S. 991, 76 S.Ct. 545, 100 L.Ed. 856 and American Cooperative Serum Association v. Anchor Serum Co., 7 Cir., 1946, 153 F.2d 907, certiorari denied 329 U.S. 721, 67 S.Ct. 57, 91 L.Ed. 625. Balian is distinguishable in that the supplier cut its price on ice cream products to all of its customers in the entire Los Angeles market area, and the Court found that there was no injury to any of the customers.[26] In American Cooperative Serum Association v. Anchor Serum Co. the Association sold directly to consumers through druggists who acted as warehousemen or agents; as a retailer the Association could meet the price of its competitors at the retail level.[27]

According to the Commission, even without any judicial gloss Section 2(b) is clear and unambiguous: "the plain wording of the proviso * * * has reference to the good faith meeting of competition of the seller, rather than that of the buyer". Sun agrees that the section is clear and unambiguous: it contains no such restrictive language as the Commission reads into it, and Sun was with-

24. It has been suggested that the "belief that Standard's price discrimination [in the Detroit Case, 340 U.S. 231, 71 S.Ct. 240, 95 L.Ed. 239] thus encouraged competition both on retail and supplier levels may well have been behind the Justice Department's open disagreement with the FTC." Comment, Price Discrimination in Gasoline Marketing, the Detroit Jobbers Case, 19 U. of Chi.L.Rev. 58, 63 (1951).

25. Rostow and Sachs write: "In short, in the case of the oil industry the beginning of analysis from the point of view of the antitrust laws is the proposition that the major companies are *oligopsonists* in the crude purchasing market and *oligopolists* in the sale of refined products." Entry Into the Oil Business, 61 Yale L.J. 856, 893 (1952). "A structurally oligopolistic market is one in which the few largest sellers in the market have a share of the market sufficient to make it likely that they will recognize the interaction of their own behavior and their rivals' response in determining the values of the market variables." Kaysen and Turner, Antitrust Policy, An Economic and Legal Analysis 27 (1959).

26. Balian was a treble damage action under the Robinson-Patman Act in which the plaintiff ice cream manufacturers in Los Angeles contended that they were injured when the defendant Arden Farms, a manufacturer and distributor, lowered its prices on ice cream products in the Los Angeles area only. The Court upheld the defense of meeting competition. A number of the ice cream manufacturing plants were "captive creameries" in that they were owned by large chains and manufactured ice cream only for their owners. Customers supplied by Arden were in competition with retail outlets supplied by the captive creameries. Arden lowered its prices to its customers, retail dealers, to enable them to meet competition at the consumer level. It is clear that the captive creameries did not offer to sell at lower prices to Arden's dealers. Arden, therefore, is in the same position as Sun in the instant case. The district court (104 F.Supp. 796, 802), as well as the Court of Appeals, did not restrict the defense of meeting competition to the single situation where a supplier's retail dealer is offered lower prices by another supplier. The Court said: "The customers of Arden in the respective areas are not in competition with each other, and the products sold in each area are sold in competition with like products manufactured by others." [350 U.S. 991, 231 F.2d 367.]

27. There is an analogy between the druggists, through whom American Cooperative Serum Association sold, and filling station operators — if one looks through the independent contractor status of gasoline retail dealers. Such dealers are something less than independent merchants and something more than the supplier's employees. They cannot try Sunoco one day and Esso the next; they are inextricably associated with the gasoline they sell. In American Cooperative Serum the Court treated the druggists as "warehousemen" or "agents"; they actually received the serum on consignment.

in the scope of the proviso in reducing its price to McLean "to meet an equally low price of a competitor", Super Test. These conflicting constructions illustrate again that the Robinson-Patman Act is not distinguished for its clarity of expression.[28]  Here the language of Section 2(b) seems imprecise enough to support either interpretation.[29]  Turning to the legislative history of the Act for enlightenment, we find Delphic generalities but no evidence that Congress considered the specific question at issue.  In the absence of aid from judicial precedents and legislative history, we are driven to determining whether Sun's construction of Section 2(b) is more meaningful and more in harmony with the purposes of the Act than the Commission's construction. This determination requires us to weigh the disparate effects of the two constructions.

For an oil company marketing gasoline through filling stations owned or leased by the operators and competing with a supplier-retailer, the practical effect of adopting the Commission's view is to excise from the Act the defense of meeting competition.

If gasoline could be canned like tomatoes and stocked like bottle goods, and if gasoline suppliers competed with each other for the retail merchant's trade, the Commission's reading of Section 2(b) would be more realistic and more reasonable than is here presented.  But the nature of gasoline, the necessity for its bulk merchandising, the responsibility of the refiner or supplier for advertising, the dependent relation of the supplier on its dealers and the dealers on a single supplier make it a "fiction", or something less substantial than a legal fiction, "to speak of price competition at the oil company sale to the station level".[30]  An oil company's product competes with the products of other refiners or suppliers in the motorists' market—through dealer outlets.[31]  And, no oil company can stay alive if it loses its dealers.

The gas station retailer is a rare bird among retail merchants.  His business is

28.  "The Robinson-Patman Act has been called, among other things, 'one of the most tortuous legislative pronouncements ever to go on the statute books'. [Dirlam and Kahn, Fair Competition, The Law and Economics of Anti-Trust Policy. 119 (1954)]. It has been dubbed 'complex and anomalous' [Markham, Report of the Attorney-General's Committee on Anti-Trust Laws, 70 Q.J.Econ. 211], 'prolix and perplexing' [Report of the Attorney General's Committee to Study Anti-Trust Laws, 172 (1955), and 'obscure' [id. at 175]. I am sure it has been called other things which have not been recorded and which could not be repeated here." Boles, Marketing and the Robinson-Patman Act, Southwestern Legal Foundation 1958 Institute on Anti-Trust Laws, 1.  See also Automatic Canteen Co. v. Federal Trade Commission, 346 U.S. 61, 65, 73 S.Ct. 1017, 97 L.Ed. 1454.

29.  Considering the difficulty of defining "competitor," "injury to competition," and "meeting competition in good faith," the Robinson-Patman Act may have the virtue Savigny ascribed to Roman law: " 'the excellence of a Roman law lay in its being neither too plain nor too obscure, but expressed in a sort of middling ob-

scurity, "Auf einem schmalen Raume mittelmässigen Dunkelheit." ' "  Quoted in Curtis, A Better Theory of Legal Interpretation, 3 Vand.L.Rev. 407, 421 (1950).

30.  Enterprise Industries, Inc. v. Texas Co., D.C., 136 F.Supp. 420, 421.

31.  "Most of the evidence seems clearly to demonstrate that a company offers discounts because its dealers are losing business to price-cutting competitors; since the major suppliers compete among themselves and with independents primarily *through* their dealers, the concessions are made in a very real sense in good faith to meet competition.  Furthermore, there is little evidence—and certainly none so far in these cases [Enterprise and the instant case, then before the Commission]—that the discriminations complained of put a halt to price competition, or even threatened to do so. On the contrary, dual distribution and discriminatory price concessions seem to have contributed on balance to the intensity of price competition, where their effects have been visible."  Integration and Competition in the Petroleum Industry, DeChazeau and Kahn, 480, (1959).

built around pumps which can be used only for his supplier's gasoline.[32] Sun sells Sunoco in pumps that say "Sunoco". Its competitor at 19th and Pearl in Jacksonville, Super Test, sells its gas in pumps that say "Super Test". Sunoco gasoline flows unchanged from Sun through Sun pumps to motorists. Sun, not some small retailer, bears the primary responsibility for advertising and for puffing Sunoco against Super Test and other gasolines even though the sales which are competitive take place at the consumer level. McLean's losing fight for survival, therefore, was a lost battle in a long war between Sunoco and Super Test gasoline and between Sun and Super Test, suppliers, each out to increase its share of the motorists' trade.

As Mr. Justice Jackson has pointed out: "Retailers' storage capacity usually is limited and they are in no position to accumulate large stocks. They can take gas only when and as they can sell it".[33]

The suppliers, therefore, must maintain gasoline stocks to meet the needs of the ultimate consumer—the motorist; and a service station, therefore, primarily is what the word indicates—a *service* station. In gasoline marketing the supplier simply cannot be cut off from the filling station operator and treated as if it competed only for the business of filling stations; oil companies compete with each other for the consumer's business.[34] The filling station operator is a conduit between the supplier and the motoring public. As Mr. Justice Jackson observed:

"But the retailer in this industry is only a conduit from the oil fields to the driver's tank, a means by which the oil companies compete to get the business of the ultimate consumer—the man in whose automobile the gas is used. * * * The retail stations, whether independent or company-owned, are the instru-

32. This practice does not violate Section 3 of the Clayton Act, 15 U.S.C.A. § 14. F. T. C. v. Sinclair Refining Co., 1923, 261 U.S. 463, 43 S.Ct. 450, 67 L.Ed. 746.

33. Dissenting opinion, Standard Oil Co. of Cal. and Standard Stations v. U. S. A., 337 U.S. 293, 323, 69 S.Ct. 1051, 1064, 93 L.Ed. 1371.

34. "The legislative history of the Robinson-Patman Act discloses that one of the major dissatisfactions with original Section 2 of the Clayton Act was the belief that it was confined to cases where the effect of a price discrimination was on competition among sellers. The Robinson-Patman Act modified a number of provisions of old Section 2, including both the competitive effect and meeting competition clauses. The modified provisions are distributed between the newly created subsections (a) and (b).

"There is no reason to suppose that when the prohibition was amended to include discriminations having adverse effects upon buyers, the failure to express a corresponding change in the meeting competition defense was anything more than the type of inadvertence which is the hallmark of the statute. For it is clear that the defense was intended to be correlative with the offense. Nor has any reason of policy been suggested for creating an imbalance between the prohibition and the justification. If the occasion for meeting competition exists, the validity of the defense should not depend on the hierarchy in the scheme of distribution at which competition is met. A multi-tiered condemnation requires a multi-tiered defense." Steed, Antitrust Problems Under Price War Conditions, Southwestern Institute on Antitrust Laws, 77, 99 (1958). Wright, Vice-President and Sales Manager for Sun testified: "In this setup the dealer actually is a conduit between the supplier, enjoying the patronage of the motorist, and the motorist and in essence they become, the dealer and the supplier become, a team of which the supplier and not the dealer assumes the major responsibility for promoting and guiding competition within the area * * *. Now, it is not the service station operator, due to the limited facilities available, who is able to supply the repeated demand for gasoline, but it is the supplier who assumes that responsibility. Service stations are just too small to permit more than a few days' supply of gasoline. * * * We were competing with the station as a retailer of Super-Test gasoline for the business of the motorists residing or working near that location, 19th and Pearl, and who would find it convenient to stop at that station."

mentalities through which competition for this ultimate market is waged." 337 U.S. at 323.

The Commission centers its argument on the contention that Sun reduced its price to McLean "to favor a particular customer in order to help that favored customer meet his competition." It is true that McLean was in a direct competition with the Super Test station across the street. It is true that he was in distress. But there is nothing in the record to show that any Sun official beat his breast over the personal plight of Gilbert V. McLean. On the contrary, the record shows that Sun reduced its price to McLean—to help itself; to meet low prices that were inducing motorists to buy Super Test instead of Sunoco gasoline. Keeping McLean in business at 19th and Pearl was keeping Sun in business at 19th and Pearl and preserving Sun's share of the market in the Jacksonville area.

An unfortunate result of narrowing the scope of Section 2(b) is that it takes flexibility out of a defense that ought to be flexible and dependent on individual competitive situations. Here the Commission gives no consideration to the fact that Super Test was a supplier-retailer. The Commission's sole criterion is whether Sun's price to McLean is lower than Sun's price to other dealers. The result is doubly unfortunate when the price-cutting supplier is a vertically-integrated company. The natural effect of the Com-

mission's holding will be to push already highly-integrated majors into combining direct retailing with their other operations—*to the detriment of non-majors, such as Super Test, as well as to the detriment of filling station operators.*

One of the purposes of the Robinson-Patman Act was to promote local ownership, protect the small, independent merchant, and reduce the trend toward monopoly.[35] Congressman Patman stated that the bill was "designed to accomplish what so far the Clayton Act has only weakly attempted, namely, to protect the independent merchant, the public whom he serves and the manufacturer from whom he buys, from exploitation by his chain competitor." 79 Cong.Rec. 9078. "The primary remedial objective of the Robinson-Patman amendment of the Clayton Act, therefore, was the protection of the smaller independent merchants from injury to their competitive position resulting from discriminatory advantages extended by manufacturers and producers to mass distributors who were using their concentrated buying power to demand and obtain price concessions and preferential allowances and services. Whereas Section 2 of the original Clayton Act was aimed at predatory practices of powerful sellers directed at elimination of *their* weaker competitors, the Robinson-Patman Act was designed to curb the predatory use of bargaining power by chain stores and other large buyers and to preserve the independence

35. The Clayton Act was primarily intended to prevent predatory practices of large sellers whose selective price-cutting, often below cost, enabled them to kill off smaller competitors. The Robinson-Patman Act was in good part the outgrowth of the FTC's investigation of chain stores. The primary purpose of the Act was to prohibit quantity discounts by large sellers where there was no cost saving attributable to the quantity sales. FTC, Final Report on the Chain Store Investigation, S.Doc. No. 4, 74th Cong., 1st Sess. (1935); S.Rep. No. 1502, 74th Cong., 2nd Sess. 4 (1946). See Austin, Price Discrimination and Related Problems under the Robinson-Patman Act 5–11, 93–96 (Amer.L.Inst.

1959); Rowe, Evolution of the Robinson-Patman Act, 57 Col.L.Rev. 1059, 1061 (1957); Palamountain, The Politics of Distribution chap. VII (1955); Rowe, Price Discrimination, Competition and Confusion: Another look at Robinson-Patman Act, 60 Yale L.J. 923 (1951); Fielda, Food Distribution in the United States, 99 U. of Pa.L.Rev. 1051 (1951); Machlup, Characteristics and Types of Price Discrimination 397, 412 (1955); Dirlam & Kahn, Fair Competition 206 (1954). Authorities on the origin and legal impact of the Act are collected in footnotes 5 and 6 of Rowe, Price Differentials and Product Differentiation: The Issues Under the Robinson-Patman Act, 664 Yale L.J. 1, 2 (1959).

of the small merchant as a factor in his local community." Austin, Price Discrimination Under the Robinson-Patman Act, p. 11 (American Law Institute, 1959). Here, ironically, the Federal Trade Commission, swept on inexorably by the logical necessities of its barren logic, finds itself in the unnatural role of fostering vertical integration at the expense of the small, independent filling station retailer.[36]

The Commission's construction gives the vertically-integrated company a competitive advantage based on the legal effect the Commission attaches to integration of retailing operations rather than on such economic factors as efficiency of merchandising, of distribution or of performance. This is not the case of an aggressive retailer, such as a supermarket, having an established policy of doing a high volume business on a low margin, consistently emphasizing price over service. As the Commission sees it, without regard to the economics of merchandising gasoline, a supplier-retailer, large or small, may with impunity undercut the retail outlet of a competing supplier. The undercut supplier may not resort to defensive tactics such as price allowance to his established outlet that in part (here, 1.7 cents) protects his dealer and himself against sporadic predatory raids.

How may a supplier protect itself in such a case? First, as the Examiner, perhaps with tongue in check, suggested, Sun could change its system of distribution, integrate its retail outlets, and sell directly to motorists through stations the company owns and operates.[37] Second, as of course the Examiner did not suggest but implicit in the suggestion, is the alternative that Sun withhold help to a filling station in distress and put the entire burden on the individual dealer— an intolerable burden, for, as this case demonstrates, an individual retailer cannot survive a price war with a company that has integrated wholesale marketing and retailing. The retail dealer operating his own filling station works on such a thin margin that the slightest cut slices to the bone, and his resources are not large enough to enable him to hold out for the duration of any long drawn out price war. A large margin makes him an easy prey to an aggressive competitor. The effect of the Commission's holding, therefore, is to bury the small, independent filling station retailer— whether the supplier takes over the ownership and operation of all its stations or, putting the entire burden on the dealer, the supplier takes no action. This dilemma and its implications could not and did not escape the attention of the Examiner or the Commission. The Examiner made—and the Commission approved—the suggestion, one that is somewhat more than banal, that if Sun should choose not to meet competition from Super Test by operating its own stations, a

---

36. "Moreover, 'by narrowing the scope of section 2(b), the decision aggravates the effect of price wars on retailers who are forced to cut their prices to maintain their volume of sales. * * * [Such a decision's] sole effect is to prohibit suppliers from lowering their wholesale prices to help their retailers meet a competitor's price cut. While this may prevent retail prices from being driven as low as might otherwise occur, the full amount of these price cuts must now come out of the dealer's profit margin. And since the ability of the retail dealer to meet price cuts normally acts as a deterrent to aggressive price-cutting * * * [such a decision] may even tend to encourage such practices." Note, The Good Fnith Defense of the Robinson-

Patman Act; A New Restriction Appraised, 66 Yale L.J. 935, 941–942.

37. The examiner's opinion, adopted by the Commission, states:
"It is true, of course, as respondent argues, that where one or some of its dealers are faced with ruinous price competition respondent must take some action or suffer the loss of such dealership and respondent's competition with its own competition, but of course this is not the law and cannot justify price discriminations injuring others. Respondent could, if it chose to, meet such competition at the dealer level by nondiscriminatory reductions in price to all dealers, or by operating its own stations and thus being in direct competition with other stations which reduce prices."

course of action naturally repugnant to the Commission, Sun could meet "competition at the dealer level by non-discriminatory reductions in price to all dealers". In other words, to avoid the dilemma and to meet competition on the corner of 19th and Pearl streets in Jacksonville, Sun, perhaps ruinously, would have to reduce its price to all of its dealers in the United States.[38] Or, assuming that the suggestion means "all dealers" in Jacksonville—in context it is not so limited—and assuming also that such price reduction would not run afoul of Anheuser-Busch,[39] the Commission would have Sun enlarge the scale of the price war and risk a chain-reaction that might set off price wars throughout Florida and Southeast United States. In either case, other oil companies, majors and non-majors, would have to meet Sun's price-cuts thereby spreading price wars and subjecting the margins of filling station operators to further compression.

Sun's restraint in taking no defensive action for four months and in giving a discount only to McLean had at least the merit of attempting to localize a disruptive price battle. Extension of similar discounts by other major suppliers and by Sun, on an area basis, promptly resulted in a price war in the area.[40] But suppose that a supplier in Sun's situation should decide that an across-the-board tank-wagon price reduction to meet competition at one location is irrational, bad business management, and more than likely to bring on a general price war. Then, if the Act must be construed as forbidding a supplier's making a price allowance to a retail outlet in distress— the effect is to freeze the price level of major brands of gasoline and to promote rigid resale price maintenance.[41]

■ Imprecise language in the Robinson-Patman Act, policy divergencies between that Act and the Sherman Act, and the interrelation of integration and com-

**38.** The Supreme Court has said that the Robinson-Patman Act does not require a seller to choose "between ruinously cutting its prices to all customers * * * or refusing to meet the competition and then ruinously raising its prices to its remaining customers to cover increased unit costs." Standard Oil Co. v. Federal Trade Commission, 1951, 340 U.S. 231, 250, 71 S.Ct. 240, 250, 95 L.Ed. 239. "The characteristic unwillingness of large national sellers to experiment with price changes will certainly be intensified if any reduction must be made in all sub-markets, and oligopolistic industries will therefore be deprived of an important source of price flexibility." Comment, Competitive Injury Under the Robinson-Patman Act, 74 Harv.L.Rev. 1597, 1603 (1961). See also Dean, Managerial Economics 458 (1951); Machlup, The Economics of Sellers Competition 465 (1952).

**39.** As noted in the Comment, Competitive Injury Under the Robinson-Patman Act, 74 Harv.L.Rev. 1597, 1599, "The cease and desist order [in Anheuser-Busch] prohibiting reductions unless proportionately made in all markets, did not disturb the pre-existing patterns of geographic variation that had been characteristic of the company's price behavior."

**40.** The record shows that in March 1956 virtually all of the stations in Duval

County sold gasoline at reduced prices. The gallonage for the county increased 28.5 per cent over the gallonage for January.

For a case study of a price war in Philadelphia that arose from a competitive situation similar to the situation in the present case and also involved Sun, see Note, Competition in Gasoline Retailing: A Price War, 101 U. of Pa. L.Rev. 647 (1953).

**41.** A practice of tailoring tank-wagon prices to meet individual competitive situations tends to reduce the effectiveness of the resale-price-maintenance characteristics, such as they are, of a major's pricing policy. The Commission's holding has the opposite effect since it tends to make for uniformity and rigidity in resale prices. Cf. Adelman's thesis: "The Act inhibits competition in the name of protecting competition." Adelman, The Consistency of the Robinson-Patman Act, 6 Stanford L.Rev. 3 (1953). See also Edwards, Maintaining Competition 159–71 (1949); Resale Price Maintenance and the Anti-Trust Laws, 18 U. of Chi.L.Rev. 369 (1951); The Swinging Door—Or How to Obey One Anti-trust Law by Violating Another, 59 Yale L.J. 158 (1949); The Good Faith Defense of the Robinson-Patman Act: A New Restriction Appraised, 66 Yale L.J. 935, 944 (1957).

petition in the petroleum industry make it difficult for the Commission and the reviewing court to apply Section 2(b) with certitude as to the correctness of its application to the issue for decision. The Commission itself has changed sides on the issue.[42] We have reached the conclusion that in this case the Commission's construction of Section 2(b): violates the policy of the Act that places emphasis on individual competitive situations; focuses on injury to particular competitors rather than on the health of the competitive process; conflicts with the purpose of the Act to protect the small retailer; fosters vertical integration of retailing operations, jeopardizing the future of the non-major as well as the independent filling station operator; discourages sound marketing in that it confers a competitive advantage on a supplier gaining trade by sporadic predatory low prices unrelated to economic factors, in the sense that a high-volume low-margin policy of a super-market is related to such economic factors as low-cost efficiency of operation and the maximization of over-all profit; denies the realities of the market place in refusing to accept the undeniable fact that a supplier of gasoline competes with a supplier-retailer at the consumer level through filling station operators; tends to spread rather than localize price wars; and makes it impossible, as a practical matter, for a supplier to defend one of its filling stations, fighting for survival, or even to defend itself against destructive price raids of a supplier-retailer. Section 2(b) should not be read so narrowly as to produce effects so out of line with national policy. These effects may be avoided, in keeping with the spirit of the law and within the letter of the law, by a broad and simple construction: under Section 2(b) a supplier may be in competition with a supplier-retailer. Here, a supplier selling gasoline that is in competition with the gasoline of a supplier-retailer and marketing its gasoline through an independent filling station that is in direct competition with a filling station owned and operated by the supplier-retailer is in competition with that supplier-retailer and entitled to assert the defense of meeting competition in good faith.

## II.

The examiner held that even if Sun could assert the Section 2(b) defense, Sun failed to satisfy the statutory requirements of the defense for two reasons. First, Sun's allowance to McLean was not to meet competition, but to undercut Super Test's price.[43] Second, Sun and McLean entered into an agreement to fix the resale price of Sunoco gasoline. Such price-fixing agreement destroys the good faith defense and violates Section 5 of the Federal Trade Commission Act.

A. The examiner's holding that Sun's allowance to McLean was to beat competition rests on the fact that the allowance of 1.7 cents was to enable McLean to post a price of 25.9 cents a gallon for Sunoco, a price then only one cent above the price of Super Test. This holding is a complete reversal of the views the examiner expressed during the

42. The position taken by the Commission in this case represents a shift in its views. Before 1956 the Commission held that price allowances such as Sun made to McLean enjoy the protection of the defense of meeting competition. See testimony of Gwynne, Chairman, FTC, before Senate Committee on the Judiciary, Subcommittee on Antitrust and Monopoly, "To Amend Section 2 of the Clayton Act" Hearings, 84th Cong. 2d Sess. (1956), p. 229–232; cf. ibid., p. 89–92. In 1956 the Senate Sub-Committee on Retailing, Distribution and Fair Trade endorsed views similar to those now held by the Commission. S.Rep. No. 2810, 84th Cong. 2d Sess. 20, 28–29 (1956).

43. One of the anomalies created by the Robinson-Patman Act is the doctrine that the primary test of good faith is whether the seller's lower price was made for the purpose of beating competition; that in competing for business a seller may equal a competitor's price but not go below it. Moss, Inc. v. F. T. C., 2 Cir., 1945, 148 F.2d 378; Porto Rican American Tobacco Co. of Porto Rico v. American Tobacco Co., 2 Cir., 1929, 30 F.2d 234.

hearing.[44] The Commission did not discuss the point in its opinion; it did, however, adopt the findings and conclusions of the examiner.

The examiner was right the first time. (1) There is evidence in the record supporting the contention that the usual price differential between a major's regular gasoline and a non-major's regular gasoline is two cents. The examiner found, however, and the record supports the finding, that: "There is also considerable evidence in the record that the price differential between the two is frequently one cent a gallon. Suffice it to say that there is not sufficient reliable, probative, and substantial evidence in the record to establish what, if any specific amount, is the usual and customary difference between major and non-major regular brands of gasoline." This of course bears importantly on the question of Sun's good faith in meeting, not undercutting, Super Test. (2) In holding that Sun's allowance of 1.7 cents to permit a posted price of 25.9 cents was to beat competition, the examiner relied on McLean's testimony that he was not hurt competitively by a two cents spread. But this conclusion assumes that Super Test had an established, relatively stable pricing charge of 24.9 cents. The record shows, however, that Super Test had a bouncing ball pricing policy. The price had dropped as low as 21.9 and 20.9 cents a gallon. October and November prices were fairly stable but from December 1

on it was beyond human knowledge to say what Super Test's price might be at any particular time and how long the price would stay put.[45] In response to a question from the examiner as to how he arrived at 25.9 cents, McLean testified that he thought it was "to keep the two cents differential". Shortly after December 27, when McLean cut his price, Super Test cut its price to 23.9 cents. Notwithstanding the unpredictable ups and downs in Super Test's prices in December, January, and February, McLean made no attempt to maintain a one cent differential or to ask Sun for any further allowance. February 16 Super Test cut its price to 22.9 cents. Two days later McLean went out of business. We point out, too, that in view of Super Test's practice of giving savings stamps, worth about one cent a gallon, the actual spread exceeded the apparent differential. It seems to us that in view of this nervous and erratic pattern of irregular prices, Sun's allowance of not quite two cents and McLean's choice of 25.9 cents were about as fair and reasonable a meeting of competition as anyone could expect. (3) In reaching this conclusion, we have also considered, as evidence of good faith, Sun's restraint over a long period of provocation and Sun's diligence in attempting to collect and evaluate the facts before taking any defensive action.

■ B. The examiner concluded, again reversing the view he held during the hearings,[46] that Sun and McLean

44. Near the end of the hearing, the examiner commented: "[The Commission said] nothing in the complaint about fixing a price or cutting the price to within one cent of the competition * * *. If you had an allegation that by fixing a price, by cutting the price or maintaining the price within one cent of the Super-Test price in order to drive Super-Test out of business or harm competition or unduly suppress competition, as you have in the Pure Oil case, then it would be entirely relevant to prove that, and it would first be necessary as a basis for that to prove that one cent would have had the effect, as you are attempting to do in the Pure Oil case. * * * On the [Commission's] theory anyone who cuts a price to compete is violating

the law and we would have uniformity of price throughout the country, which is exactly what we do not want. * * * I do not think the one-cent differential has anything to do with the case."

45. On December 1, 1955 Super Test regular gasoline was priced at 26.9 cents a gallon. December 4 it dropped to 21.9. December 5 it went back to 26.9. December 12 it was down again to 21.9. December 13 the price started at 26.9 then dropped to 21.9. December 17 it was again 26.9. December 27 it was 24.9. January 3, 1956, it dropped to 23.9. February 16 it went to 22.9 and February 28 to 19.9.

46. The examiner stated that the argument of the Commission did not "make sense."

entered in a price-fixing agreement or understanding. Price-fixing is per se unlawful. United States v. Socony Vacuum Oil Co., 1940, 310 U.S. 150, 223, 60 S.Ct. 811, 84 L.Ed. 1129. We recognize that direct proof of such agreement is not necessary, and that the Commission is charged with fact-finding. But the difficulty of proving an "understanding" and the acceptability of circumstantial evidence as proof do not justify relaxing the requirement that substantial evidence must support the Commission's findings and conclusions. As we read the record as a whole, there is no substantial evidence to support the Commission's finding of a price-fixing agreement. McLean, testifying a year after he had been forced out of business, apparently not actuated by any love for Sun, unequivocally stated that he had no agreement or understanding with Sun as to his retail price.[47] Sun's regional manager and sales manager, who handled the allowance to McLean, were subjected to rigorous cross-examination. They testified that Sun does not fix the retail price for its dealers, and did not have an agreement or understanding with McLean as to his resale prices. He could post any price, and 25.9 was the price he selected. Two of the four Sun dealers allegedly injured

did testify that McLean told them that he was "very dissatisfied with the arrangement", but they refused to state that he had told them that he had an agreement with Sun or that Sun required him to fix a price of 25.9 cents.

The inference of price-fixing is based, as the examiner phrased it, on McLean's "testimony that he was required to take a cut in prices ['and drop his retail price to 25.9'] * * * in order to secure the discount of 1.7 cents per gallon from [petitioner]". The record shows, however, that the arithmetic of the situation, not Sun, required a discount of 1.7 cents and compelled McLean to take a cut of 1.3 cents, if he wished to post a price of 25.9 cents and still keep a bare subsistence margin of 3.5 cents above the tank-wagon price. That is what McLean was trying to say when he talked about being "required" to take a cut and having his margin of profit "reduced". He had no difficulty in making it clear that there was no agreement, no *quid pro quo*, and he saw no inconsistency in his testimony. When Sun finally lowered its tank-wagon price to McLean, it is fair to assume that Sun would not have done so, if McLean had intended maintaining his price of 28.9 cents a gallon. Such an arrangement would have given him a margin of

He said: "[Y]ou then jump to the conclusion that they must have agreed to fix the price because the price was a one-cent differential, but that might just as well have been a unilateral decision on the part of McLean or a unilateral decision on the part of Sun, if they controlled the price, as you claim. That would not be any evidence of an agreement between Sun Oil and McLean."

47. McLean testified:
"Q. What kind of an understanding did you have with Sun Oil Company leading up to them giving you this price adjustment? A. Well, I think I had been after them to get that price adjustment and on that day—I was closed for one or two days—and that day the salesman came around, Mr. Harper, and he said— I was talking to him about it and he said if it continued, if they dropped again, Super Test dropped again, that they would try to do something about it.

"He stayed around, I guess, 30 minutes or an hour and then he went off and on that day they did drop their prices and they gave me an adjustment and I dropped mine.
"Q. Now, is that all—what were you required to do if anything to get the adjustment? A. To take a cut.
* * * * *
"Q. I will ask you this, then: Weren't you required to do something to obtain that? A. To obtain that price?
"Hearing Examiner Piper: Yes. A. No, I dropped my gas but I wasn't required—I didn't have no agreement with them as far as lowering my price or raising my price or anything. There was no agreement made.
"Q. Was there anything said to you about reducing your margin or profit? A. Yes my margin of profit was reduced."

484

6.5 cents, clearly an unjustifiable preference over other Sun dealers.

This is a long way from a price-fixing agreement.

For the foregoing reasons, we set aside the Federal Trade Commission's cease and desist order issued against Sun Oil Company January 5, 1959.